Filed 8/11/22; Certified for Publication 9/12/22 (order attached)
See concurring opinion

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GREGORY JERMAINE THOMPSON,<br><br>    Defendant and Appellant. | H044699<br>(Santa Clara County<br>Super. Ct. No. C1514611) |

## I.    INTRODUCTION

In the early morning hours of June 27, 2015, Marvin Jackson, Jr. was shot and killed by an unknown assailant in downtown San Jose.  Jackson had been out on the town with his half-brother, William Maynard, and several friends.  Maynard had gotten into an argument with the assailant and his associates within a half hour of the shooting.

A jury found defendant Gregory Jermaine Thompson guilty of the offense, convicting him of first degree murder (Pen. Code, § 187, subd. (a))[1] and possession of a firearm by a felon (§ 29800, subd. (a)(1)), and finding true the allegation that he personally and intentionally discharged a firearm in the commission of the murder (§ 12022.53, subd. (d)).  After a bifurcated court trial, the court found true the allegations that defendant had a prior juvenile strike adjudication (§§ 667, subds. (b)-(i), 1170.12) and had served a

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

prior prison term (§ 667.5, subd. (b)).  The court sentenced defendant to 76 years to life, imposed various fines and fees, and ordered victim restitution.

Defendant contends that the trial court violated his right to an impartial jury, equal protection, and due process when it improperly dismissed a prospective juror for cause; the prosecutor committed misconduct when he partially told the fable of the scorpion and the frog during jury voir dire and the court erred when it denied defendant's mistrial motion based on the misconduct; the court erred when it admitted evidence of his brother's witness intimidation and Facebook internet searches because the evidence was irrelevant and more prejudicial than probative; and the cumulative prejudice from the trial errors violated his right to due process.  Regarding sentencing, defendant claims that the prior prison term enhancement must be stricken; remand is required to allow the trial court an opportunity to exercise its new discretion to strike the firearm enhancement or impose a lesser enhancement; the criminal justice administration fee was unauthorized; insufficient evidence supports part of the restitution order; the court erred when it imposed the fines and fees without determining defendant's ability to pay and abused its discretion when it imposed the maximum restitution fine; and the use of a prior juvenile adjudication as a strike enhancement violated his right to a jury trial.  Regarding almost all of the claims, defendant contends that if the claim has been forfeited, he received ineffective assistance of counsel.

The Attorney General concedes that the prior prison term enhancement must be stricken and that the case must be remanded to allow the court an opportunity to exercise its discretion to strike the firearm enhancement, and states that defendant may raise his inability to pay the fines and fees on remand.  Regarding defendant's remaining claims, the Attorney General asserts that there was neither error nor prejudice.

For reasons that we will explain, we will remand the matter for resentencing for the trial court to strike the prior prison term enhancement; to consider whether to exercise its discretion to strike the firearm enhancement or to impose a lesser enhancement; and to

2

vacate the portion of the $129.75 criminal justice administration fee that remained unpaid as of July 1, 2021. On remand, defendant may raise his inability to pay the fines and fees and his claim that he is entitled to the reimbursement of any portion of the criminal justice administration fee that he has already paid because the fee was unauthorized.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Prosecution Case*

#### 1. The Incident

In the early morning hours of June 27, 2015, Marvin Jackson, Jr. and his younger half-brother, William Maynard, went to La Victoria Taqueria in downtown San Jose at the end of a night out. Accompanying the brothers were Jackson's girlfriend and two friends, Jordan Hayes and Theodore Syddall. As the group left the restaurant around 2:12 a.m., Maynard got into an argument with someone on the restaurant's front steps. Maynard was drunk. Another person joined in the argument. When the argument continued into an alleyway, the group arguing with Maynard grew to six or seven people. Jackson got involved and tried to break it up. " 'Crip' " and " 'Blood' " were mentioned more than once.

Someone from the other group lifted his shirt and flashed a gun at Maynard. The person with the gun said something like, " 'You don't want these problems. Come around the corner,' " or, " 'Back up before you get blasted.' " Jackson tried to calm everyone down and keep the two groups away from each other. Jackson shook someone's hand. The man with the gun remained tense and upset.

Jackson, Maynard, and the rest of their party headed toward their car. Maynard noticed that two members of the group were following them—the man with the gun who was wearing a hoodie and another man. Maynard lost sight of them as he continued walking toward the car.

3

Hayes and Syddall stopped in a parking lot to chat with some friends. Jackson and Maynard lagged behind. At some point, Maynard began arguing with the two men. Jackson and Maynard approached the men and a fight ensued.

One of the men punched Maynard in the face. The other man came around with a gun. Maynard saw a flash and heard three gunshots. Syddall heard two gunshots. The men ran off.

Maynard noticed Jackson on the ground bleeding from his head. Maynard saw that Jackson had been shot and tried to administer CPR. Maynard thought the person who shot Jackson was the same man who flashed the gun at him earlier because he was wearing the same hoodie. Maynard did not see the shooter's face and was unable to identify defendant at trial.

Jackson died from a gunshot wound to the left side of his forehead. Jackson also had multiple blunt-force injuries and a contusion on his left eye. A bullet fragment was recovered from Jackson's brain.

### 2. Law Enforcement Investigation

Police found two .380 caliber shell casings at the homicide scene at Second and San Carlos Streets. There was an intermittent blood trail approximately 80 feet long leading away from the scene. Police took several swabs of the blood trail.

Officers stopped Trevon Woods and Khalil Owens in the vicinity of the homicide because they matched the general description of the suspects. When neither man was identified in an in-field identification procedure, the men were released. Neither man had a weapon or blood on his clothes.

Police gathered video surveillance footage showing the entrance to the taqueria. The footage showed defendant, Owens, Jessie Gulley, and Maynard arguing. Unlike defendant, Owens was wearing a hoodie. According to Jackson's father, Jackson did not know defendant, Owens, or Gulley.

4

During an interview three days after the shooting, police showed Maynard surveillance footage from the front porch of the taqueria. Maynard identified Owens as the shooter. Owens was arrested and charged with Jackson's homicide. Owens's black hoodie tested negative for gunshot residue. At the conclusion of a police interview, Owens stated that defendant and Gulley were responsible for the shooting.

At some point, Hayes was interviewed by the police and gave a general description of the people arguing outside of the taqueria with Maynard. Hayes was shown a photographic lineup. Hayes identified defendant as the person saying, " 'Take it around the corner.' "

Police met with Maynard again on August 21, 2015, and asked Maynard what his identification of Owens had been based on. Maynard stated that he identified the shooter based on his clothing. Maynard consistently said that the person who flashed a gun at him during the argument at the taqueria was the shooter.[2] Maynard was unable to identify defendant in a police lineup, telling the police that he had not seen him.[3]

The homicide detective assigned to the case concluded that there was no longer probable cause to believe that Owens was the shooter. Police obtained an arrest warrant for defendant on September 4, 2015. Defendant was arrested in Marina on October 18, 2015. Defendant gave the arresting officer a San Jose address.

A district attorney investigator listened to recorded jail calls between defendant and defendant's brother, George Thompson. During a February 2016 call, defendant told George that "the victim[']s brother . . . doesn't know the shooter by face, that's why he didn't pick me out of the line-up." Defendant relayed that Maynard stated that he knew the shooter's clothing, which matched someone else's description, not defendant's.

---

[2] Maynard testified at trial that he was not sure if the person who flashed the gun was shooter.

[3] In a subsequent police interview, Maynard confused defendant and Owens "as being the same person." At one point, Maynard identified Owens as the shooter in surveillance footage.

The investigator executed a search warrant at defendant's residence on August 2, 2016. The investigator found a bore brush used to clean handguns in a kitchen cabinet. Based on the brush's size, the investigator opined that it could be used to clean a 9-millimeter or .38, .357, or .380 caliber gun.

The parties stipulated that red-brown stains were found on Jackson's right hand. Jackson was the source of the major DNA profile developed from the stains. Gulley was a possible contributor of the minor DNA profile developed from the stains.

The parties stipulated that Gulley was the source of the DNA profile developed from the swabs of the blood trail leading away from the homicide scene.

The parties stipulated regarding count 2 that defendant had previously been convicted of a felony.

### 3. Khalil Owens's Testimony

Khalil Owens testified that he was with two friends at La Victoria Taqueria on the date of the shooting. At some point Owens heard an argument. When Owens heard the word, " 'Blood,' " he walked over to where the argument was occurring because he is a Blood.

Owens saw a verbal confrontation occurring between defendant, Gulley, Jackson, and Maynard. Owens had known defendant for about a year and Gulley for about six months to a year. Gulley was a Crip. Defendant said, " 'My nigga's a Blood.' " Owens told Maynard to calm down, but he did not listen. Owens challenged Maynard to a fight. Maynard refused. Owens talked to Jackson and they shook hands. The argument eventually ended. Owens did not see anyone pull a gun out.

Owens testified that Jackson and Maynard walked toward Second and Santa Clara Streets. Owens went into a nearby Jack In The Box and then to Iguanas restaurant, on Third Street, where he saw defendant and Gulley talking outside the front gate. Defendant had a bulge on his hip. After a few minutes, defendant and Gulley left in the direction of Second Street. Owens went back to Jack In The Box and heard two gunshots.

6

Owens ran toward the sound of the gunshots on Second Street.  Owens saw Jackson on the ground with his girlfriend crying over him and two people he could not identify running away.  Owens saw a gun on the ground.

Owens ran back toward the Jack In The Box to get his friend Trevon Woods.  Owens told Trevon Woods, " 'Let's go.' "  As Owens and Trevon Woods were walking toward a 7-Eleven, they were stopped by San Jose State police near a parking structure.  The men were released after they were not identified in an in-field identification.

Owens stated that during a police interview, he lied when he denied that he had information about the offense.  Owens was concerned about "snitching."  At some point Owens began to tell the police some of the truth.  Owens did not want to implicate anyone.  Owens was released from custody on October 8.

Owens testified for the prosecution at the preliminary hearing.  After his testimony, he was threatened on Facebook.  A photograph was posted of him testifying.  "[U]nkind comments" were written after the photograph was posted and Owens was called a " 'snitch.' "

Owens was in custody on a 2014 robbery when he testified at trial.  No promises were made to Owens in exchange for his testimony in this case.  Owens had committed two robberies as a juvenile and was convicted in 2014 for the unlawful taking of a motor vehicle and the sale of marijuana.

### 4.  Jessie Gulley's Testimony

Jessie Gulley testified that he saw defendant at La Victoria Taqueria on the date of the shooting.  Defendant was outside the restaurant with some friends.  Defendant and Owens started talking to Jackson's girlfriend, thinking she was someone else.  Things became heated, and defendant and Owens were yelling and arguing with Maynard.  Other people joined in.  Gulley heard someone say, " 'Blood.' "  Gulley also heard Maynard call defendant a " 'bitch.' "  Gulley did not see a gun.  Eventually the argument ended and people went their separate ways.

Gulley stated that he subsequently found defendant, Owens, and two others arguing about the situation in front of Iguanas restaurant. Owens said, " 'You let that fool call you a bitch,' " and, " 'You know what you got to do.' " Gulley told defendant it was not worth it. Gulley could see that defendant had a bulge on his hip and something black on his waistband. Defendant was mad. Defendant and the others started walking back toward San Carlos Street.

Somewhere around Second and San Carlos Streets, Jackson and Maynard approached Gulley. Maynard asked Gulley, " 'What's up,' " and threw a punch at him. Gulley punched Maynard, who fell. Jackson ran up to Gulley and threw a punch at him. Gulley was about to punch Jackson in return when Jackson began to back up. Gulley looked over his shoulder and saw defendant with a gun out. Gulley grabbed the front of the gun and told defendant, " 'Nah, nah.' " Defendant shot Gulley's left hand.

Gulley turned his back to defendant and ran. Gulley heard two more shots and turned to see Jackson on the ground with people around him. Gulley, who was bleeding, ran toward a McDonald's.

Gulley told defendant that he had shot him. Defendant said, " 'You shouldn't grab it.' " Gulley got into his car and defendant went across the street toward several businesses and a parking lot.

Gulley testified that the day after the murder, defendant told him that if he said anything, he would have a problem. Defendant said that he knew where Gulley and his family lived so " '[his] best bet . . . is to leave it . . . as it is.' " Gulley was concerned by what defendant said.

Gulley testified that when he was interviewed by the police he only partially told the truth. He did not tell them that he knew who the shooter was; he just said that it was a Black man in a black shirt or hoodie. Eventually Gulley told the police that he had been shot. Gulley has scars on his left hand from the entry and exit wounds.

8

Gulley testified regarding video surveillance footage taken after the shooting. Gulley stated that the footage showed him running and wrapping his jacket around his left hand because he had been shot. Gulley identified defendant as the person running behind him in the footage and stated that at one point defendant could be seen on the footage putting the gun away.

Gulley stated that he was currently in custody on this case and another case. Gulley was arrested in this case in July 2015. In May 2016, Gulley agreed to be interviewed by the prosecution about this case. No promises were made to him. Gulley entered into a plea agreement in this case in July 2016. In exchange for Gulley telling the truth and cooperating with the prosecution, Gulley would face a maximum sentence of five years eight months in this case. Gulley had prior juvenile adjudications for making criminal threats and displaying a weapon.

### 5. Evidence of Witness Intimidation by Defendant's Brother

George Thompson is defendant's brother. George lived at the same address that defendant gave at the time of his arrest.

George attended the preliminary hearing on March 8, 2016. George identified himself as "John" when a district attorney investigator asked his name.

### a. Intimidation of Khalil Owens

After the preliminary hearing, a photograph was posted on the George Thompson, Jr. Facebook account of Owens testifying. The photograph was taken from the area where George had been seated during the hearing. The George Thompson, Jr. Facebook account commented on the photo, " 'Some snitch who on the stand testify.' " The account also posted a status update stating, " 'He got that ET Finger. Hashtag stop snitching.' " Other accounts posted comments on the photograph. Facebook records showed that the George Thompson, Jr. account searched for " 'Wizzy Going' " or " 'Wizzy,' " which was Owen's moniker, on April 5, 7, and 8.

9

### b. Intimidation of Sean Woods

During a recorded jail call, George told defendant that he had seen "Brah" at the preliminary hearing. George said that he asked "Brah" what he was doing there and he responded that he had been subpoenaed. George told the person, "Don't be showing up over here." The person responded, "[N]ah man. I ain't coming."

The prosecution had subpoenaed Sean Woods to testify at the preliminary hearing, but he failed to appear. Facebook records revealed that the George Thompson, Jr. account had searched for " 'Sean Woods' " three times the day before the preliminary hearing. George was subsequently arrested for the witness intimidation of Sean Woods.

### c. Intimidation of Jessie Gulley

Gulley testified on cross-examination that before he was arrested, George told him, " 'Long as you keep your mouth shut, I'll make sure that your family's good and everything's good.' " Gulley also stated that he was in a physical fight with George about four years ago and believed George would have killed him but for the fact that someone stopped him. On redirect examination, Gulley testified that he was fearful about testifying because George knew a lot about his family and George was a leader of the "Crip from RTG" gang.

### 6. Additional Internet Searches on the Facebook Account

An investigation into the George Thompson Jr. Facebook account revealed that the account had searched for news stations at 3:37 a.m., 3:38 a.m., and 3:46 a.m. on June 27, 2015, approximately an hour after the shooting. In the over 2,000 pages of records associated with the account, there was only one other search for news.

The account searched for " 'Marvin Jackson Jr.' " at 6:13 p.m. on June 29, 2015. The Mercury News had published an article on Jackson that morning. There were many other searches for " 'Marvin Jackson' " and " 'Marvin Jackson Jr.' " by the George

10

Thompson, Jr. Facebook account on June 29. On July 3, 2015 at 1:39 a.m., the account conducted a search for Jackson in San Jose.

**B.** *Defense Case*

Rodrik Kalantarian testified that he was parked on Second Street in downtown San Jose on the night of the incident. While he was resting in his car, he saw two groups shouting at each other. Kalantarian heard what sounded like a gun being loaded and saw a gun. Kalantarian backed his car up. Kalantarian saw a man holding a gun in his right hand. The man was wearing a black baseball hat with some red on it, a black zippered jacket, and blue jeans. Kalantarian believed the man was Hispanic but he was not certain. The man holding the gun was in a group of three of four people. As Kalantarian was driving away he heard two gunshots. Some of the people involved ran past his car while he was trying to get out of the parking lot.

Victoria Koumarianos testified that she was waiting for her grandfather to get off work in downtown San Jose around 1:30 a.m. on June 27, 2015. Koumarianos heard two to three gunshots in the area of San Carlos and Second Streets. Two men ran in her direction, one of whom was wearing a white and black sweater. Another man wearing a white and black striped sweater ran near an office building. Someone else ran in the other direction toward San Jose State University; Koumarianos believed she saw a gun in the person's hand. Koumarianos told the police that the person with the gun was wearing a black hoodie.

Defense investigator Anne Fields testified that she tried to subpoena several witnesses, including Jonathan Chisolm and Trevon Woods. Fields stated that on some of the surveillance footage showing La Victoria Taqueria and Jack In The Box, a man could be seen walking toward several utility boxes behind the Jack In The Box before going out of view. In addition to the utility boxes, there was also a dumpster and a cement hole in the ground with a lid behind the Jack In The Box.

San Jose Police Detective Raul Corral testified that he believed only Gulley stated that the argument in front of La Victoria's Taqueria pertained to a misunderstanding about

11

two women wearing white dresses. And Gulley was the only witness to the shooting who stated that he put his hand on the gun. Detective Corral stated that in the surveillance footage of defendant running behind Gulley, defendant was holding a hat in his left hand.

Detective Corral testified that there was a utility hole near the Jack In The Box where Owens disappeared on the surveillance footage for a few seconds. Detective Corral did not search the hole, but it appeared that a gun could fit in it. There were also utility boxes in the area where someone could discard an item. Detective Corral did not search the utility boxes. Detective Corral stated that surveillance footage showed Owens going in the direction of the shooting. The footage also showed Owens and Trevon Woods run by later, likely sometime after the shooting.

Detective Corral testified that surveillance footage from the taqueria appears to show a verbal disagreement between defendant and Maynard. Defendant is wearing a hat. It looked from the video like Maynard was backing defendant up toward a van before defendant walked away. In contrast to Maynard's testimony, the video does not show Maynard backing up. At some point the video showed Owens walking in the same direction as Jackson and Maynard. Owens's arm was outstretched. Owens is not seen on the footage in the location again until he came back running toward the Jack In The Box.

Detective Corral stated that in his October 28, 2015 police interview, Maynard identified Owens as the shooter in video footage, which was consistent with his June statement. By the October interview, defendant had been arrested and Owens had been released. During the October interview, when there was a video still of defendant in front of him, Maynard stated that the shooter had stripes on his sleeves, which was consistent with what defendant was wearing.

## C.  *Procedural History*

Defendant and Gulley were charged with first degree murder (§ 187, subd. (a); count 1), and it was alleged that they committed the offense for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(5)) and that

12

defendant personally and intentionally discharged a firearm causing death (§ 12022.53, subds. (b)-(d)). Defendant was also charged with possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2). It was alleged that defendant had served two prior prison terms (§ 667.5, subd. (b)) and had a prior juvenile strike adjudication. Owens was not charged in this case.

The gang allegations were subsequently dismissed.

Gulley entered into a plea agreement with the prosecution, pleading guilty to accessory to murder (§ 32).

A jury found defendant guilty of both counts and found the firearm allegation true. At a court trial on the prior prison term and strike allegations, the court dismissed one of the prior prison term allegations at the prosecution's request and found the remaining allegations true.

The trial court denied defendant's *Romero*[4] motion to strike the prior strike allegation. The court sentenced defendant to 76 years to life as follows: 25 years to life on count 1, which the court doubled pursuant to the Three Strikes law; 25 years to life for the firearm enhancement; and one year for the prior prison term enhancement. The court imposed a concurrent four-year term on count 2. The court imposed various fines and fees and ordered defendant to pay $13,083 in victim restitution.

### III. DISCUSSION

#### A. *Excusal of a Prospective Juror for Cause*

Defendant contends that the trial court violated his Sixth Amendment right to an impartial jury and his Fourteenth Amendment rights to equal protection and due process when it excused a prospective juror for cause. Defendant argues that the court abused its discretion and improperly found cause to excuse the prospective juror based on his concern that Black defendants are treated unfairly by the criminal justice system. Defendant asserts,

---

[4] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

13

"The court's ruling, if viewed on a systemic level, was problematic in that it would potentially eliminate jurors who recognize racial bias and have concerns regarding it." Defendant further contends that if his counsel failed to preserve the issue for review, she rendered constitutionally ineffective assistance. The Attorney General contends that the dismissal of a prospective juror for cause does not constitute reversible error and that, in any event, the issue has been forfeited and defendant has not demonstrated that his counsel was constitutionally deficient.

### 1. Trial Court Proceedings

During voir dire, the court asked the prospective jurors whether they would have trouble following the instruction that punishment cannot be considered in their deliberations. Prospective juror Y.B. responded, "I think . . . it matters to me . . . [¶] . . . [¶] . . . to know whether the person's guilty or not guilty, what will happen . . . on my judgment . . . . I want to know what's going to happen if I take one position or the other." The court explained that jurors determine the facts and that punishment cannot be considered because it has no relevance in the determination of what occurred. The court asked Y.B. if he could leave the punishment up to the court and just consider the facts, and Y.B. responded, "Would be very hard," and that he "need[ed] to understand the circumstances around the crime."

During subsequent individual questioning where the prospective jurors answered a set of questions, Y.B. stated that he could not answer question No. 10, which appears to have been whether he could be a fair and impartial juror. When the trial court asked him why he could not answer the question, Y.B. stated, "Because I believe everybody come with different bias, even the judge, even the police officers. And I'm no different." He then stated that he was "willing to listen . . . to the arguments" and that he had his "own beliefs." Y.B. relayed that when he was a student in Berkeley, he had an experience where an officer asked him for his driver's license. When Y.B. reached for his license in the inside pocket of his jacket, the officer reached for his gun. Y.B. stated, "If I had been [B]lack, I would be dead." Y.B. said that "[t]his is [his] perspective" and "is something that mark[ed] [him]."

14

Y.B. stated that he would listen to police officers' testimony, "[b]ut you need to understand I come in with that background."

The court asked Y.B. if he believed that police officers have an inherent bias against Black people. Y.B. responded, "No." The court asked if Y.B. would be able to listen to the officers' testimony and not hold his experience against them. Y.B. responded, "I will listen."

The court asked Y.B., "So do you think that the system -- just overall -- there's no way for us to be fair to [defendant] because he's [B]lack?" Y.B. answered, "It is difficult. I mean, the data shows it's difficult all around the nation. If you are an analytical kind of guy, if you look at the data over . . . the nation, it is difficult for a [B]lack person to get a fair trial in U.S., the outcome." When the court asked if Y.B. meant statistically, Y.B. said, "They are convicted at a higher rate." The court asked whether Y.B. thought the conviction rate was "automatically due to . . . bias in the system?" Y.B. responded, "It could be." The court asked, "Could it be other things?" Y.B. answered, "Could be." The court asked, "[S]o how would we ever have a trial for a [B]lack person, then?" Y.B. responded, "I'm not a judge. Sorry."

Defense counsel later had the opportunity to question Y.B. outside the presence of the other prospective jurors. Defense counsel asked Y.B. whether he would not be a good juror because he did not think that a Black person would get a fair trial. Y.B. stated that "[w]hat [he] said is what [he] know[s] from the facts"; that it was his general perspective; that he did not see many Black people in the jury pool; and that "[t]here might be a bias there against a [B]lack defendant." When counsel asked Y.B. whether "in a personal situation" he listened to all the facts and made a decision based on the facts alone, Y.B. responded that he was not "the judge of deciding the sentence," but "maybe the defendant is guilty and the facts will prove he's guilty. I'm sorry, but I want to -- my judgment of -- of guilty will be influenced with the sentence meaning [¶] . . . [¶] I want to do more than just being a judge -- me being a jury. [¶] . . . [¶] I don't want to be just saying, 'This person --

15

yeah, the data is he's guilty,' and not worry about what can happen to the person." Y.B. added that he was concerned that he "would, even after the trial, not get the sufficient information to make a conclusion."

Defense counsel stated, "Well, I think the judge is going to excuse you. But, from my position, it's jurors like you that we need on the jury venire. That's all I have to say. Because you're being critical, and you're waiting for the evidence, and you're not going to make a decision unless you hear all the evidence. [¶] So I'm sorry that you're being excused. I actually think you'd be a very good juror. I think that you would know everything." The court interjected that defense counsel's statements were an "improper [¶] . . . [¶] comment" and told counsel that she could put an objection on the record.

The court stated that it was going to excuse Y.B. because he had "made very clear . . . that he does not believe that [defendant], as a [B]lack man, would get a fair trial in the American justice system" and that "he was resistant to being a juror given the fact that he does not have any say in sentencing."

Defense counsel stated, "And, your Honor, part of the reason I made the comments was because I didn't want the juror to think that I was attacking him, because I felt like some of my questions might have been a challenging way [*sic*]. So I was trying to explain to him that I was not being challenging." The court thanked Y.B. and told him that he was excused.

### 2. Forfeiture

In *People v. Holt* (1997) 15 Cal.4th 619, 658 (*Holt*), the California Supreme Court held that "an objection must be made if a claim of error in excusing the juror [for cause] is to be preserved for appeal." (See also *People v. Gutierrez* (2009) 45 Cal.4th 789, 805 (*Gutierrez*) ["By failing to object, [the] defendant forfeited his claim that the trial court erred in excusing Prospective Juror F.K. for cause," including that the excusal violated the defendant's Sixth and Fourteenth Amendment rights to a fair trial].) The court stated that "[t]he reason for such a rule is apparent. We cannot assume that a party who fails to object

16

to the excusal of a juror wants to have that juror on the panel.  Taking a neutral position as defendant did here may be a tactical choice.  If the juror is excused, the defendant need not use a peremptory challenge to remove the juror.  Having made that choice the defendant should not be heard to complain on appeal that excusing the juror was reversible error." (*Holt*, *supra*, at p. 657).  "The requirement of a contemporaneous and specific objection promotes the fair and correct resolution of a claim of error both at trial and on appeal, and thereby furthers the interests of reliability and finality."  (*Ibid.*)

Based on the record before us, we conclude that defendant's claim has been forfeited. Although defense counsel stated that she was sorry that Y.B. was being excused and thought that he would be "a very good juror," would "wait[] for the evidence," and would "not . . . make a decision unless [he] hear[d] all the evidence," counsel did not state a legal objection to Y.B.'s excusal despite that the trial court explicitly told counsel that she "can put an objection on the record."  Rather, defense counsel stated that "part of the reason [she] made the comments was because she did not want Y.B. to think [she] was attacking him" and she wanted "to explain to him that [she] was not being challenging."

Defendant argues that counsel's statements were "adequate because [they] gave the trial court a fair opportunity to rule."  Importantly, however, defendant did not claim in the trial court, as he does here, that Y.B.'s responses were statements of fact, not expressions of actual bias, and that there was no evidence of bias to justify the excusal.  Rather, defense counsel stated to Y.B. that "it's jurors like you that we need on the jury venire. . . .  Because you're being critical, and you're waiting for the evidence, and you're not going to make a decision unless you hear all the evidence."  Nor did defendant contend below that the excusal violated his Sixth and Fourteenth Amendment rights.  "[D]efendant's failure to make a timely and specific objection on the ground[s] he now raises forfeits the claim on appeal."  (*People v. Pearson* (2013) 56 Cal.4th 393, 416.)

Defendant asserts that the error was structural and cannot be forfeited.  However, the California Supreme Court "ha[s] rejected '[the] assumption that an error in excusing a juror

17

for reasons unrelated to the [juror's] views on imposition of the death penalty requires reversal. "[T]he general rule [is] that an erroneous exclusion of a juror for cause provides no basis for overturning a judgment." [Citation.]' [Citation.]" (*People v. Tate* (2010) 49 Cal.4th 635, 672.)

For these reasons, we conclude that defendant's claim that the trial court erred when it excused Y.B. for cause has been forfeited. (See *Holt*, *supra*, 15 Cal.4th at pp. 656-658; *Gutierrez*, *supra*, 45 Cal.4th at p. 805.)

### 3. Ineffective Assistance of Counsel

Defendant contends that if his claim that the trial court erred when it excused Y.B. for cause has been forfeited, his counsel provided constitutionally ineffective assistance.

To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish both that his or her counsel's performance was deficient and that he or she suffered prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) The deficient performance component of an ineffective assistance of counsel claim requires a showing that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms. (*Id.* at p. 688.) "When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation. [Citation.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 569 (*Anderson*).) Regarding prejudice, a "defendant must show that there is a reasonable probability"— meaning "a probability sufficient to undermine confidence in the outcome"—"that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, at p. 694.) Prejudice requires a showing of "a ' "demonstrable reality," ' not simply speculation.' " (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241 (*Fairbank*).)

Here, the record is silent regarding why counsel did not object to Y.B.'s excusal for cause and thus "affords no basis for concluding that counsel's omission was not based on an informed tactical choice." (*Anderson*, *supra*, 25 Cal.4th at p. 569.) Reversal on direct

18

appeal for ineffective assistance of counsel is warranted only if "(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).) None of those criteria is met here.

As the court suggested in *Holt*, perhaps counsel determined that Y.B.'s excusal was favorable, despite her comments to Y.B. to the contrary, and would eliminate the need to use a peremptory challenge against him. (See *Holt*, *supra*, 15 Cal.4th at p. 657; cf. *People v. Lenix* (2008) 44 Cal.4th 602, 622-624 [discussing the complexity and fluidity of jury selection in the context of a *Batson/Wheeler*[5] claim].) Or perhaps counsel understood that Y.B.'s reluctance to decide the facts without consideration of punishment made him properly subject to excusal for cause. "Counsel is not required to proffer futile objections." (*Anderson*, *supra*, 25 Cal.4th at p. 587.) A juror may be constitutionally excused for cause if the juror's views would " ' " ' " 'prevent or substantially impair' " the performance of the juror's duties as defined by the court's instructions and the juror's oath.' " ' " (*People v. Armstrong* (2019) 6 Cal.5th 735, 750.) It is settled that jurors may not consider a defendant's possible punishment or "the consequences of their verdicts." (*Shannon v. United States* (1994) 512 U.S. 573, 579; *People v. Honeycutt* (1977) 20 Cal.3d 150, 157, fn. 4; CALCRIM No. 200.) Throughout voir dire, Y.B. consistently voiced his desire to know what would happen to defendant if he was found guilty and stated at the conclusion of his questioning that he was "not taking the position of the judge . . . of deciding the sentence. But to me -- maybe the defendant is guilty and the facts will prove he's guilty. I'm sorry, but I want to -- my judgment of -- of guilty will be influenced with the sentence meaning [¶] . . . [¶] I want to do more than just being a judge -- me being a jury. [¶] . . . [¶]

---

[5] *People v. Batson* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258.

I don't want to be just saying, 'This person -- yeah, the data is he's guilty,' and not worry about what can happen to the person."

Moreover, defendant has failed to establish "a reasonable probability that . . . the result of the proceeding would have been different" had counsel objected to Y.B.'s excusal. (*Strickland*, *supra*, 466 U.S. at p. 694.) Defendant asserts solely that "the error was prejudicial . . . since an appropriate objection would have kept this juror on the panel and avoided any concerns among the jury pool by seeing this juror removed without cause." However, Y.B. was questioned, in part, outside of the other prospective jurors' presence and was excused outside of their presence, so the jury pool did not "see[] [him] removed without cause," and would have had no basis to conclude as such. And the impaneled jury was instructed that it must decide the facts "based only on the evidence" presented at trial. We presume that the jury followed the court's instructions. (*People v. Flinner* (2020) 10 Cal.5th 686, 717 (*Flinner*).) Because defendant's prejudice contention is essentially speculative, it must be rejected. (See *Fairbank*, *supra*, 16 Cal.4th at p. 1241.)

### B. *Prosecutorial Misconduct During Voir Dire and Failure to Grant a Mistrial*

Defendant contends that during jury voir dire the prosecutor committed misconduct and violated his Sixth and Fourteenth Amendment rights when he told the prospective jurors part of the fable of the scorpion and the frog while he explained that he was not required to prove motive. Our colleagues in the Second District have summarized the fable as follows: "There is a fable about the frog and the scorpion. It stresses the scorpion will sting, no matter what, because *that is in its nature*." (*People v. Del Rio* (2020) 54 Cal.App.5th 47, 54 (*Del Rio*); see also *In re Las Vegas Monorail Co.* (Bankr. D.Nev. 2010) 429 B.R. 317, 338, fn. 37 [detailed recounting of the fable].) Defendant argues that the prosecutor's use of the fable was improper because it was a character argument and was racially discriminatory. Defendant further contends that the trial court erred when it denied his request for a mistrial and that the failure to grant a mistrial violated his Sixth and Fourteenth Amendment rights.

20

The Attorney General contends that defendant has not shown a reasonable likelihood that the jury understood the prosecutor's comments as permitting it to convict defendant based on race and that the court did not abuse its discretion when it denied defendant's mistrial motion.

### 1. Trial Court Proceedings

During voir dire, the prosecutor explained that he did not have to prove motive and asked certain prospective jurors whether they could convict without motive evidence if he proved the case beyond a reasonable doubt. All of the prospective jurors questioned indicated that they could follow the law on motive. The prosecutor then stated, "So there's . . . a story of a scorpion and a frog," and asked a prospective juror if she knew the fable. The prospective juror responded affirmatively. The prosecutor continued, "Okay. So it's the scorpion goes up to the frog right before he wants to cross the river." Defense counsel asked to approach. The court stated, "No, you don't need to approach. I'm going to not allow that." The prosecutor acknowledged the court's ruling and moved on.

Defense counsel moved for a mistrial when the prospective jurors were in recess. Counsel asserted, "I believe that [the prosecutor], by bringing up the frog and the scorpion joke has poisoned the jury pool, for those of them who have heard it, because the punch line is 'It's in his nature.' [¶] So I'm not sure exactly what he was going for, but it seems to me that it could imply that he was going to try to say that it was in [defendant's] nature to do whatever it is that he did. And I think that . . . there were some [prospective jurors] that said, yes, they know the joke. [¶] And I find it inappropriate. And I . . . can't even speculate as to where he was going, but I think the damage may have already been done, because that's going to be in the minds of the jurors who heard and know the joke."

The court denied the mistrial motion, observing that the prosecutor had been prevented from telling the entirety of the fable and that the fable was mentioned during the discussion on motive. The court stated that it assumed defendant was going to object when counsel asked for a sidebar and that it sustained the presumed objection because the fable

"does have a character evidence aspect to it.  [¶]  But the jury didn't hear it.  It was in the context of motive or lack of motive, which is certainly a lesson also to be taken from that story.  So I . . . don't think it's in any way sort of poisoning the well of the jury.  So I'm going to deny that motion."

## 2.  Prosecutorial Misconduct

Defendant contends that the prosecutor's partial telling of the scorpion and the frog fable during voir dire was improper in two respects:  (1) it was a character argument; and (2) it was racially discriminatory.

"A prosecutor's conduct violates the federal Constitution when it infects the trial with unfairness, and violates state law if it involves the use of deceptive or reprehensible methods of persuasion.  [Citation.]  To preserve a misconduct claim for appellate review, a defendant must make a timely objection and ask the trial court to admonish the jury to disregard the remark (or conduct) unless such an admonition would not have cured the harm.  [Citation.] When the claim focuses on the prosecutor's comments to the jury, we determine whether there was a reasonable likelihood that the jury construed or applied any of the remarks in an objectionable fashion.  [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 184-185 (*Booker*).)  " 'In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]'  [Citations.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 667 (*Centeno*).)

Because defendant did not request an admonition when the prosecutor partially told the scorpion and the frog fable, his prosecutorial misconduct claim has been waived.  (See *Booker*, *supra*, 51 Cal.4th at p. 184; *People v. Medina* (1995) 11 Cal.4th 694, 740 (*Medina*) [forfeiture rule applies to claimed misconduct during jury voir dire].)  Although defendant baldly asserts that an admonition would not have cured the prejudice from the comments, the prosecution's statements were limited to, "there's a story of a scorpion and a frog," and, "it's the scorpion goes up to the frog right before he wants to cross the river."  Given the trial court's interruption of the prosecutor early in his recitation of the fable, the court's

22

statement that it "[would] not allow that," and that the comments occurred during voir dire, which is " 'a much less critical phase of the proceedings' " (*Medina, supra,* at p. 741), we conclude that any prejudice from the comments could have been cured by an admonition.

But even if defendant's prosecutorial misconduct claim had been preserved, we would find no reversible error. Regarding defendant's federal constitutional rights, we determine that the limited comments were not " ' " 'so egregious that [they] infect[ed] the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 726.) The voir dire comments " 'did not comprise a pattern of egregious misbehavior making the trial fundamentally unfair.' " (*People v. Winbush* (2017) 2 Cal.5th 402, 484; see also *People v. Forrest* (2017) 7 Cal.App.5th 1074, 1085-1086 [to constitute a denial of due process, " ' "it is not enough that the prosecutor's remarks were undesirable or even universally condemned" ' "].)

Regarding whether the comments were improper under state law, a prosecutor commits misconduct when he or she misleads the jury on the law (see *People v. Hill* (1998) 17 Cal.4th 800, 845), and California law generally disallows the use of character evidence (see Evid. Code, § 1101, subd. (a)). But as the trial court observed when it denied the mistrial motion, the prospective jurors did not hear the character aspect, or "moral," of the scorpion and the frog fable because the court halted the prosecutor's recitation of the story before he got to it. Nonetheless, the court and counsel inferred from the prosecutor's remarks that the prosecutor's reference to the fable appeared to have been an attempt to suggest that a lack of motive could be explained by nature or character. To the extent the prospective jurors understood the prosecutor's statements to mean that the law allows the consideration of character evidence, the comments were improper. (See *Del Rio, supra,* 54 Cal.App.5th at p. 54 ["The character evidence rule bans th[e] kind of evidence" discussed in the scorpion and the frog fable].)

Defendant contends that the comments were also improper because they were racially discriminatory and racially charged. Defendant argues that the prosecutor's use of

the fable "continues a long history of [B]lack defendants being dehumanized by animal imagery."[6]

To be clear, "a prosecutor may not compare a defendant to a beast for the purpose of dehumanizing him [or her] before the jury or in an effort to evoke the jury's racial biases." (*People v. Powell* (2018) 6 Cal.5th 136, 183.) Here, the prosecutor's exact words were, "there's a story of a scorpion and a frog," and, "it's the scorpion goes up to the frog right before he wants to cross the river." We are mindful that " 'we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements' " and that there must be "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." (*Centeno*, *supra*, 60 Cal.4th at p. 667.) We are also mindful that prospective jurors arrive at voir dire with varied life experiences that may influence how such comments are perceived. Defendant argues that some of the prospective jurors may have been familiar with the fable, and that those familiar with it may have interpreted the prosecutor's comments to be race based. We agree that some jurors who were familiar with the fable, based on their lived experiences and perceptions, could have believed it was race based. However, because the recitation of the fable was incomplete, and absent a record establishing the breadth of juror familiarity with

---

[6] Defendant points to section 745, which was added to the Penal Code pursuant to the Legislature's recent passage of the California Racial Justice Act of 2020 (Stats. 2020, ch. 317, § 3.5), but correctly concedes that it does not apply retroactively to this case (see § 745, subd. (j) [section 745 "applies only prospectively in cases in which judgment has not been entered prior to January 1, 2021"]).

Section 745 provides that "[t]he state shall not seek or obtain a criminal conviction . . . on the basis of race . . . ." (§ 745, subd. (a).) "A violation is established if the defendant proves, by a preponderance of the evidence" that an attorney "used racially discriminatory language about the defendant's race, . . . or otherwise exhibited bias or animus towards the defendant because of the defendant's race . . . whether or not purposeful." (*Id.*, subd. (a)(2).) " 'Racially discriminatory language' means language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin." (*Id.*, subd. (h)(3).)

24

the fable, it would be mere speculation whether "there was a reasonable likelihood that the jury construed or applied any of the remarks in an objectionable fashion." (*Booker*, *supra*, 51 Cal.4th at pp. 184-185.) Nevertheless, courts and counsel must be aware of explicit and implicit racial biases. "The Legislature has acknowledged that all persons possess implicit biases [citation], that these biases impact the criminal justice system [citation], and that negative implicit biases tend to disfavor people of color." (Stats. 2020, ch. 317, § 2, subd. (g).) We strongly encourage judicial officers and counsel to be vigilant in their efforts to ensure compliance with the Racial Justice Act and the provision of fair trials.

After careful review of the record, we conclude that defendant has not demonstrated prejudice as it is not "reasonably probable the trial outcome was affected." (*People v. Shazier* (2014) 60 Cal.4th 109, 127 (*Shazier*).) "[A]s a general matter, it is unlikely that errors or misconduct occurring during voir dire questioning will unduly influence the jury's verdict in the case. Any such errors or misconduct 'prior to the presentation of argument or evidence, obviously reach the jury panel at a much less critical phase of the proceedings, before its attention has even begun to focus upon the . . . issue[s] confronting it.' [Citation.]" (*Medina*, *supra*, 11 Cal.4th at p. 741.)

Further, the prosecutor's comments occurred during a discussion on motive and the prosecutor was interrupted before he reached the character aspect of the fable, leaving his comments quite ambiguous for those unfamiliar with the story. And the trial court clearly announced that it would "not allow" the fable. Once impaneled, the jury was instructed "not [to] let bias, sympathy, prejudice or public opinion influence [its] decision." During the instructions at the conclusion of the evidence, the jury was told that the attorneys' comments were not evidence; that it must decide the case based solely on the evidence; and that it could "not . . . let bias, sympathy, prejudice, or public opinion influence [its] decision," including "bias for or against the witnesses, attorneys, defendant, or alleged victims based on disability, gender, nationality, national origin, race or ethnicity, religion, gender identity, sexual orientation, age, or socioeconomic status." We presume that the jury followed the

court's instructions. (*Flinner*, *supra*, 10 Cal.5th at p. 717.) Thus, we determine that it is not "reasonably probable the trial outcome was affected" by the prosecutor's remarks. (*Shazier*, *supra*, 60 Cal.4th at p. 127.)

For all of these reasons, we conclude that the prosecutor did not commit reversible error during his discussion of motive in jury voir dire when he stated that "there's a story of a scorpion and a frog," and, "it's the scorpion goes up to the frog right before he wants to cross the river."

### 3. Denial of Mistrial Motion

Defendant contends that based on the seriousness of the prosecutor's misconduct, the trial court abused its discretion when it denied his motion for a mistrial. Defendant asserts that the racially charged and discriminatory language could "[not] help but infect the entire trial, and there was no cure for the prejudice engendered by th[e] comparison" of defendant to a scorpion.

" 'A court should grant a mistrial " 'only when a party's chances of receiving a fair trial have been irreparably damaged.' " [Citation.] This generally occurs when " ' " 'the court is apprised of prejudice that it judges incurable by admonition or instruction.' " ' " [Citation.] We review the trial court's refusal to grant a mistrial for abuse of discretion.' [Citation.]" (*People v. Wright* (2021) 12 Cal.5th 419, 447.) " ' "Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." ' " (*People v. Schultz* (2020) 10 Cal.5th 623, 673 (*Schultz*).)

We conclude that the trial court did not abuse its discretion when it denied the mistrial motion. As we stated above and as the court observed when it denied the mistrial motion, the prospective jurors did not hear the character aspect of the scorpion and the frog fable from the prosecutor's comments, "there's a story of a scorpion and a frog," and, "it's the scorpion goes up to the frog right before he wants to cross the river," because the court halted the prosecutor's recitation of the story. The prosecutor's limited remarks were such

26

that defense counsel stated that she was "not sure exactly what he was going for," although it seemed "he was going to try to say it was in [defendant's] nature." Nor did the prospective jurors hear a comparison of defendant to the scorpion. The remarks occurred during voir dire, "a much less critical phase of the proceedings" (*Medina*, *supra*, 11 Cal.4th at p. 741), and the court clearly signaled that the telling of the fable was "not allow[ed]." The day after the comments, the court instructed the impaneled jurors, "Your verdict must be based only on the evidence presented during trial in this court and the law as I provide it to you"; "Evidence include[s] witness testimony and exhibits"; and "Do not let bias, sympathy, prejudice, or public opinion influence your decision."

Thus, based on the brevity and vagueness of the prosecutor's comments, the fact that the statements were made during voir dire, the trial court's disallowance of the fable, and the court's instructions to the impaneled jury the following day, we determine that the court did not abuse its " ' "considerable discretion" ' " when it implicitly found that defendant's chances of receiving a fair trial had not been " 'irreparably damaged' " by the prosecutor's statements and denied the mistrial motion. (*Schultz*, *supra*, 10 Cal.5th at p. 673.)

## C.    *Evidence of George's Intimidation of Sean Woods*

Defendant contends that the trial court abused its discretion when it admitted evidence that defendant's brother George intimidated prospective witness Sean Woods. Defendant argues that the evidence was irrelevant and more prejudicial than probative. Defendant further asserts that the evidence was so inflammatory that it violated his Fourteenth Amendment right to due process. The Attorney General contends that defendant's claim has been forfeited and that the court did not abuse its discretion when it admitted the evidence because it was probative of Owens's and Gulley's credibility and not particularly prejudicial.

### 1.  Trial Court Proceedings

The prosecution moved in limine to present evidence of a recorded jail call between defendant and George the night after defendant's preliminary hearing. The prosecution

asserted that Woods had been subpoenaed to testify at the preliminary hearing but did not appear. The prosecution stated that during the jail call, George said that " 'bro' " showed up at the preliminary hearing and George told him, " '[D]on't be showing up over here.' " The prosecution contended that the evidence "is consistent with the other forms of witness intimidation that George . . . has engaged in"; the evidence was "highly relevant"; and the evidence "shows [d]efendant's complicity in the witness intimidation" because at no point did defendant tell George that he should not have done it.

During the hearing on the in limine motion, the prosecution stated that it had been informed by Woods's counsel that Woods would refuse to testify at trial. The prosecution relayed that when Woods was arrested in January 2016 in an unrelated case, he told the police that defendant made an admission to him about his role in the homicide. Woods was subpoenaed for the preliminary hearing but was the only witness who failed to appear. The prosecution stated that George's witness intimidation pertained to witnesses' credibility and that it was not asking for it to be admitted as evidence of defendant's guilt.

Defendant stated that the jail call had just been disclosed the afternoon before the hearing and that there was no evidence that he had asked George to do anything.

The court ruled that it would allow the evidence of George's intimidation of several witnesses including Woods. The court stated that if there was an insufficient connection between George's conduct and defendant, it would instruct the jury that the evidence pertained to the credibility of the witnesses subject to the intimidation and that the jury was "not to use it against [defendant]."

Defendant subsequently filed a motion in limine objecting to the evidence of George's witness intimidation, including his intimidation of Woods. Defendant argued that the evidence was not admissible to rehabilitate a witness's credibility and that even if it were, its probative value was far outweighed by its prejudicial effect.

In response to defendant's motion, the court maintained its previous ruling that the prosecution could present the evidence of witness intimidation. The court stated that absent

28

any indication that the conduct was connected to defendant, it intended to instruct the jury that it was not to consider the evidence for any purpose other than "the effect it has on the persons testifying who are aware that there has been efforts towards witness intimidation."

The prosecution did not call Woods as a witness at trial.[7]

The prosecution presented evidence at trial that Woods was subpoenaed to testify at the preliminary hearing but failed to appear. During an investigator's testimony, defendant objected to the prosecutor's question asking the investigator why he was at the preliminary hearing. A bench conference was held off the record. The prosecution then asked if the investigator was at the hearing to provide security for Owens, and the investigator said yes.

Later during the investigator's testimony, evidence was admitted that in a jail call in March 2016, George told defendant that he had attended the preliminary hearing. George stated that he had seen "Brah" at the hearing. George said that he asked the person what he was doing there and the person responded that he had been subpoenaed. George told the person, "Don't be showing up over here." The person responded, "[N]ah man. I ain't coming." George was subsequently arrested for the witness intimidation of Sean Woods.

Evidence was also admitted that on the date Woods was subpoenaed for the preliminary hearing, George Thompson's Facebook account searched for " 'Sean Woods' " approximately three times.

After both sides rested, the court included in its instructions to the jury the following pinpoint instruction: "You have heard testimony regarding conduct associated with George Thompson and others attempting to influence Khalil Ow[en]s and/or Se[a]n Woods as potential witnesses in this matter. There has been no evidence presented linking this

_____

[7] During an Evidence Code section 402 hearing outside the presence of the jury, Woods invoked his Fifth Amendment privilege against self-incrimination in response to the prosecution's questions and was granted use immunity at the prosecution's request. Woods then testified at the hearing that he lied to the police about his conversation with defendant and that defendant did not make statements to him regarding a murder in downtown San Jose. Woods also stated that he did not remember talking to George at the preliminary hearing.

conduct to the defendant and you may not use that evidence against the defendant in any way. You may, however, use that evidence to help you determine the credibility of Khalil Owen[s]'s and Jessie Gulley's testimony."

At defendant's sentencing, counsel requested to make a record of several things that occurred during trial. Counsel stated that at the bench conference during the investigator's testimony, she "asked the court considering the fact that . . . Woods . . . was not going to be testifying, that perhaps it would not be appropriate, based on the court's in limine ruling, that [the investigator] discuss the alleged intimidation of . . . Woods . . . ." Counsel continued, "Because my understanding of the in limine ruling was that the court was saying that that information with regard to George['s] . . . actions was coming in . . . with regard to the testimony of . . . Woods and how those events had affected [his] testimony. [¶] And my argument was that since [Woods] was not testifying, that they were no longer -- that was no longer relevant. [¶] And at the bench, I believe the court overruled that request and the [Woods] information did come in anyway." The court stated, "All right," and asked the prosecution if it wanted to address counsel's statements. The prosecution declined.

### 2. Forfeiture

Relying on Evidence Code section 353, the Attorney General contends that defendant's claims regarding the evidence of George's intimidation of Woods have been forfeited because he did not object to the evidence at trial. The Attorney General argues that defendant's motion in limine did not preserve the claims because it was unclear at that point whether Woods would testify. The Attorney General asserts that defense counsel failed to state a legal basis for defendant's objection to the evidence when counsel made a record of it at sentencing.

Evidence Code section 353, subdivision (a) provides that "[a] verdict . . . shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] There appears of record an objection to or a

motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion."

The California Supreme Court has explained that Evidence Code section 353 requires an " 'objection [to] be made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the [proponent] an opportunity to establish its admissibility.' [Citation.] What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling. If the court overrules the objection, the objecting party may argue on appeal that the evidence should have been excluded for the reason asserted at trial, but it may not argue on appeal that the court should have excluded the evidence for a reason different from the one stated at trial. A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*People v. Partida* (2005) 37 Cal.4th 428, 435 (*Partida*).)

Defendant claims on appeal that the Woods intimidation evidence was irrelevant because Woods's credibility was not at issue as he did not testify at trial and neither Gulley nor Owens testified regarding Woods. Defendant further contends that the evidence was more prejudicial than probative as it had no bearing on any testifying witness's credibility and "could only have reflected negatively on [defendant]." Defendant asserts that the evidence's admission violated his Fourteenth Amendment right to due process.

Based on the trial record, we conclude that defendant adequately preserved his claims regarding the Woods intimidation evidence. Defendant's motion in limine notified the court that he was objecting to the evidence on the basis that it was inadmissible to rehabilitate a witness's credibility and that it was more prejudicial than probative and would only "tarnish [defendant] by association." And defendant's objection during the investigator's testimony alerted the court that defendant objected to the evidence because it "was no longer relevant"

31

as Woods was not testifying at trial. While the Attorney General argues that the record does not demonstrate the accuracy of counsel's recitation of defendant's objection during the investigator's testimony since counsel put the basis of the objection on the record four months after the trial and "[n]either the court nor the prosecutor confirmed" it, the court and the prosecution had the opportunity to clarify or correct counsel's statements and did not do so. The court simply stated, "All right."

Evidence Code section 353's requirement of a specific objection "must be interpreted reasonably, not formalistically." (*Partida*, *supra*, 37 Cal.4th at p. 434.) Here, there was enough specificity to "fairly inform" the trial court of the bases of defendant's objection, and defendant's claims on appeal reasonably resemble his trial court arguments. (*Id.* at p. 435.) And under *Partida*, defendant "may argue that the asserted error in admitting the evidence . . . had the additional legal consequence of violating due process," despite that he did not make a due process argument below. (*Ibid.*) Thus, we conclude that defendant's claims regarding the Woods intimidation evidence have not been forfeited.

### 3. Legal Principles and Standard of Review

" ' "Only relevant evidence is admissible (Evid.Code, § 350; [citations] ), and, except as otherwise provided by statute, all relevant evidence is admissible[.] (Evid. Code, § 351; see also Cal. Const., art. I, § 28, subd. (d) . . .)." [Citation.]' " (*People v. Tully* (2012) 54 Cal.4th 952, 1010 (*Tully*).) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Relevant evidence must be excluded "when its probative value is *substantially* outweighed by its prejudicial effect." (*People v. Tran* (2011) 51 Cal.4th 1040, 1047 (*Tran*); Evid. Code, § 352.)

We "appl[y] the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence." (*People v. Waidla* (2000) 22 Cal.4th 690, 723 (*Waidla*).) "The trial court has broad discretion to determine the relevance of evidence [citation], and

32

we will not disturb the court's exercise of that discretion unless it acted in an arbitrary, capricious or patently absurd manner." (*People v. Jones* (2013) 57 Cal.4th 899, 947 (*Jones*).) Likewise, "[a] trial court's exercise of discretion under section 352 will be upheld on appeal unless the court . . . exercised its discretion in an arbitrary, capricious, or patently absurd manner." (*People v. Thomas* (2012) 53 Cal.4th 771, 806 (*Thomas*).)

### 4. Analysis

The trial court did not elaborate on the reasons for its ruling that it would allow the prosecution to present evidence that George intimidated Woods other than to state that it would instruct the jury that the evidence pertained to "the credibility of the witnesses subject to the intimidation." The court instructed the jury that it could "use th[e] evidence to help . . . determine the credibility of Khalil Owen's and Jessie Gulley's testimony." We therefore glean from the court's statement and its instruction that it implicitly found the Woods intimidation evidence relevant to Owens's and Gulley's credibility and not substantially more prejudicial than probative.

We find the evidence to be of limited relevance to Owens's and Gulley's credibility. Both Owens and Gulley testified to acts of intimidation by George. That George also intimidated Woods tended to corroborate Owens's and Gulley's testimony that George intimidated them and to bolster their credibility generally.

Owens and Gulley were key prosecution witnesses whose credibility was contested at trial. Owens testified that defendant was one of the people who had engaged in a verbal confrontation with Maynard; he saw a bulge on defendant's hip that night; and before he heard the gunshots, he saw defendant walking in the direction of the crime scene. Gulley testified that Maynard had called defendant a " 'bitch' " outside of the taqueria, and Gulley placed defendant at the scene of the shooting with a gun. Gulley stated that defendant shot his hand when he grabbed defendant's gun and that as he ran from defendant, he heard two more gunshots before he turned and saw Jackson on the ground. Both Owens and Gulley

33

admitted during their testimony that they had lied to the police during the investigation of this case, and Maynard initially identified Owens as the shooter.

Defendant's theory, in contrast, was that Owens killed Jackson, and defendant repeatedly challenged Owens's and Gulley's credibility. Given that the Woods intimidation evidence bolstered Owens's and Gulley's credibility and that their credibility was contested, the trial court's implicit determination of relevance was not "arbitrary, capricious or patently absurd." (*Jones*, *supra*, 57 Cal.4th at p. 947.) While defendant argues that the evidence "essentially constituted impermissible character evidence against George (Evid. Code, § 1101)," defendant did not object to the evidence on that ground below and is foreclosed from doing so here. (See *Partida*, *supra*, 37 Cal.4th at p. 435 [a defendant "may not argue that the court should have excluded the evidence for a reason different from his trial objection"].)

We also conclude that the trial court did not abuse its discretion when it implicitly determined that the Woods intimidation evidence was not substantially more prejudicial than probative. As we stated above, the evidence was somewhat probative of Owens's and Gulley's credibility, and the trial court limited the evidence's use to helping the jury determine Owens's and Gulley's credibility.

Defendant argues that the recorded jail call between George and defendant "only provided a speculative inference that George was even referring to . . . Woods," presumably because during the call George referred to the person he spoke to at the preliminary hearing only as "Brah." However, because the evidence was relevant to Owens's and Gulley's credibility generally and their testimony regarding George's conduct toward them, it was not particularly important that it was Woods who George also intimidated. And the jail call made clear that George at the very least told someone who was subpoenaed for the hearing not to "be showing up over here." There was also evidence that the George Thompson Jr. Facebook account had searched for "Sean Woods" several times the day before the preliminary hearing; that Woods failed to appear at the hearing; and that George was

34

arrested for intimidating Woods. It was reasonable to infer from this evidence that George was referring to Woods as "Brah" during the jail call.

Defendant argues that the evidence "could only have reflected negatively on [him] since . . . it indicated his brother was going around intimidating numerous witnesses." The trial court forbade the jury from using the evidence against defendant "in any way," however, and told the jury that "[t]here has been no evidence presented linking this conduct to the defendant." We presume that the jury followed the court's instruction that it could only use the evidence to help it determine Owens's and Gulley's credibility. (See *Flinner*, *supra*, 10 Cal.5th at p. 717.) And given the evidence that George had also intimidated Owens and Gulley, was once violent with Gulley, and was the leader of a Crip gang, and that defendant had told Gulley the day after the shooting that if he said anything, he would have a problem, the evidence of George's intimidation of Woods was not particularly inflammatory.

For these reasons, we conclude that the trial court's implicit determination that the Woods intimidation evidence was not substantially more prejudicial than probative was not an abuse of discretion as it was not "arbitrary, capricious, or patently absurd." (*Thomas*, *supra*, 53 Cal.4th at p. 806.)

### 5. Due Process Claim

Even if we were to assume that the trial court abused its discretion when it admitted the Woods intimidation evidence, we would not find that the evidence's admission rendered the trial "*fundamentally unfair*" such that it violated defendant's due process rights. (*Partida*, *supra*, 37 Cal.4th at p. 399.) "To prove a deprivation of federal due process rights, [defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citation.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper

purpose.' [Citation.] 'The dispositive issue is . . . whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." [Citations.]' [Citation.]" (*People v. Albarran* (2007) 149 Cal.App.4th 214, 231 [determining that irrelevant gang evidence that included threats to kill police officers violated the due process clause].)

Defendant argues that the evidence violated due process "given [its] inflammatory nature," but does not elaborate on that point other than by reiterating that the evidence could only have been credited against him and was speculative. Defendant also compares this case to *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378 (*McKinney*).

In *McKinney*, the defendant was convicted of murdering his mother by slitting her throat with a knife. (*McKinney*, *supra*, 993 F.2d at p. 1381.) The trial court admitted evidence that the defendant possessed various knives, occasionally strapped a knife to his body while wearing camouflage pants, and had scratched the words " 'Death is His' " on a closet door. (*Id.* at p. 1382.) The Ninth Circuit concluded that there were no permissible inferences the jury could have drawn from the evidence as it was solely probative of the defendant's propensity to possess knives. (*Id.* at p. 1384.) It is unclear from the decision whether defendant objected to the evidence on propensity grounds below. The Ninth Circuit concluded that the "emotionally charged" evidence rendered the defendant's trial fundamentally unfair as the prosecution's evidence against him was solely circumstantial and there was no motive for the crime. (*Id.* at p. 1385.)

In contrast here, the Woods intimidation evidence was relevant to Owens's and Gulley's credibility and was not admitted as proof of defendant's guilt. It was also not "emotionally charged." (*McKinney*, *supra*, 993 F.2d at p. 1385.) Thus, we find *McKinney* inapposite.

Regarding defendant's remaining contentions, as we explained above the evidence could not have been "credited against him" because the trial court instructed the jury that it could not use the evidence against defendant. (See *Flinner*, *supra*, 10 Cal.5th at p. 717.)

36

Further, the court told the jury after a defense investigator testified, which was on the same day the Woods intimidation evidence was admitted, "[I]f a witness does not testify, that is not evidence. There is no speculating as to what they would have said, what they could have said. That -- that's improper. [¶] . . . There's other witnesses that you think might have involvement. If you don't hear their testimony, you cannot consider it. You can't hold it against the Defense; you can't hold it against the Prosecution. You can't hold it to the benefit of the Defense; you can't hold it to the benefit of the Prosecution. And I just wanted that -- to reemphasize that." And, as stated above, the evidence was not particularly inflammatory.

For these reasons, we conclude that the evidence did not render the trial "*fundamentally unfair*." (*Partida*, *supra*, 37 Cal.4th at p. 439.)

### 6. Prejudice from the Assumed Error

"Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson*[8] test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*Partida*, *supra*, 37 Cal.4th at p. 439.) Even if we were to assume that the admission of the Woods intimidation evidence violated state law, we would determine that the error was harmless under *Watson* based on the evidence against defendant and the trial court's instructions to the jury.

The evidence against defendant was fairly strong. Video surveillance footage showed defendant and several others involved in an argument with Maynard, who is Jackson's half-brother, on the date of the shooting. Although Maynard testified at trial that he was not sure if the person who flashed the gun was the shooter, he consistently told the police that during the argument the shooter flashed a gun at him. Maynard testified that the man with the gun said something like, " 'You don't want these problems. Come around the

---

8 *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).

corner.' " Hayes, who was with Maynard and Jackson during the argument, identified defendant as the person saying, " 'Take it around the corner.' "

Owens and Gulley, who were in the group associated with defendant, both testified that on the night of the shooting they saw a bulge on defendant's hip. Gulley testified that during the argument, Maynard called defendant " 'bitch,' " and that afterwards Owens told defendant, " 'You know what you got to do,' " providing a motive for the shooting.

Gulley was present at the shooting. Gulley stated that Jackson punched him, and when he was about to punch Jackson in return, he saw defendant with a gun out. Gulley grabbed the gun. Defendant shot Gulley's hand and Gulley ran, bleeding, before hearing more gunshots and seeing Jackson on the ground. Gulley's testimony was partially corroborated by his inclusion as a possible contributor to the minor DNA profile developed from the blood stains on Jackson's hand; Gulley's trail of blood leading from the scene; the scarring on Gulley's hand; and the surveillance footage showing Gulley wrapping a jacket around his hand and running. Gulley identified defendant as the person running behind him in the surveillance footage and stated that the footage showed defendant putting the gun away. Gulley further testified that when he told defendant that he had shot him, defendant said that he " 'shouldn't grab it.' " Gulley stated that the day after the shooting, defendant told him that if he said anything, he would have a problem and that defendant's brother subsequently threatened him, too.

In addition, defendant stated to his brother George during a recorded jail call that Maynard was unable to identify him in a lineup because he did not know the shooter's face. It is reasonable to view this evidence as an admission by defendant that he was the shooter.

Also supporting our finding of harmlessness is the trial court's limiting instruction on the witness intimidation evidence. As we stated above, the court told the jury that "[t]here has been no evidence presented linking this conduct to the defendant and you may not use that evidence against the defendant in any way. You may, however, use that evidence to help you determine the credibility of Khalil Owen's and Jessie Gulley's testimony."

Defense counsel repeated the instruction during her closing argument, and we presume that the jury followed it. (See *Flinner*, *supra*, 10 Cal.5th at p. 717.)

For these reasons, we determine that it is not "reasonably probable that a result more favorable to [defendant] would have been reached" absent the admission of evidence that George intimidated Woods, and we reject defendant's claims that the court committed reversible error when it admitted the evidence. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

### D.    *Evidence of Internet Searches on the George Thompson, Jr. Facebook Account*

Defendant contends that the trial court erred when it admitted evidence of internet searches performed on the George Thompson Jr. Facebook account. As we stated above, George Thompson is defendant's brother. The evidence consisted of searches for news stations shortly after the shooting occurred; searches for Jackson in the days following the shooting; and searches for " 'Wizzy' " " 'Wizzy Going' " in April 2016.[9] "Wizzy" is Owens's moniker. Defendant contends that the evidence was irrelevant, more prejudicial than probative, and violated his Fourteenth Amendment right to due process. The Attorney General contends that the evidence of the news stations searches and the searches for Jackson shortly after the shooting was probative of defendant's involvement in the offense and that the evidence of the searches for Owens was relevant to Owens's credibility. The Attorney General denies that any of the internet search evidence was more prejudicial than probative or that the evidence violated defendant's right to due process.

### 1.  Trial Court Proceedings

The prosecution moved in limine to present evidence that the George Thompson Jr. Facebook account conducted 12 searches for Jackson within several minutes a few days

---

[9] Defendant also contends that the court erred when it admitted evidence of internet searches on the Facebook account for Woods. Because defendant included this same evidence in his claim that the court erred when it admitted evidence of George's intimidation of Woods, we do not address it separately here. We reject it for the same reasons stated above.

after the shooting; 1 search for Jackson six days after the shooting; and searches for " 'Wizzy Going' " in April 2016, after the preliminary hearing. The prosecution contended that the searches for Jackson were relevant to witnesses' credibility and tended to establish defendant's identity as the shooter as defendant was not yet a suspect when the searches occurred. The prosecution contended that the searches for " 'Wizzy Going' " were relevant to Owens's credibility and state of mind because defendant's brother, George, attempted to dissuade Owens from testifying.

At the hearing on the motion, the prosecution reiterated the arguments in its motion and added that the searches for Owens were relevant to defendant's identity as the shooter.

Defendant contended that it was speculative and not reasonable to infer from the searches that he admitted to George that he was the shooter as it was possible that Gulley told George about the shooting or that defendant himself told George about it since there was no dispute that defendant was in the vicinity of the shooting. Defendant also argued that "there has to be some connection" between him and the search evidence and that the evidence was more prejudicial than probative, would confuse the issues, and would prevent him from receiving a fair trial.

The court ruled that it would allow evidence of George's intimidation of witnesses and the related Facebook searches. The court stated that if there was not a sufficient connection between defendant and the evidence, it would instruct the jurors that the evidence related solely to "judging the credibility of the witnesses who were the victims of the [witness] intimidation, but they are not to use it against [defendant]." The court delayed its ruling on the evidence of the searches for Jackson.

Defendant subsequently filed a motion in limine objecting to the witness intimidation evidence, the related Facebook searches, and the searches for Jackson. Defendant reiterated his arguments that the evidence was speculative, not relevant, and more prejudicial than probative and that there was no evidence linking him to George's conduct. The court

maintained its prior ruling regarding the witness intimidation evidence and "the extrinsic proof" of George's conduct.

During the trial testimony of a prosecution investigator, an unreported bench conference was held when the prosecution began questioning the investigator about the George Thompson, Jr. Facebook account. The investigator subsequently testified that on the date of the shooting, the account conducted at least three searches for news stations, such as " 'KRON 4 News.' " The first search occurred on the date of the murder at 3:37 a.m.; the second search occurred at 3:38 a.m.; and the third search occurred at 3:46 a.m. The investigator stated that in his review of a couple thousand pages of account records, he found only one other search for news, which appeared to be a random search and "was not clustered with others."

The investigator testified that the Facebook account searched for " 'Marvin Jackson Jr.' " two days after the murder. An article with Jackson's name in it had appeared in a newspaper earlier that day, but defendant had not been named as a suspect yet. The investigator stated that there were "many searches" for Jackson that date, some occurring just seconds apart, and testified to approximately 13 searches related to Jackson. The investigator testified that there was "a more specific search . . . for 'Marvin Jackson Jr. San Jose CA' " six days after the murder.

The investigator also testified about George's intimidation of Owens. After stating that a photograph of Owens testifying at the preliminary hearing had been posted to the George Thompson Jr. Facebook account as well as various comments about the photograph, including " '[h]ashtag stop snitching,' " the investigator testified that there were four searches by the account for " 'Wizzy Going' " or " 'Wizzy.' "

Later during the investigator's testimony, the court admonished the jury, "You've heard evidence related to a photograph of Mr. Owens and conduct relating to 'hashtag snitch' -- evidence of that sort. I'm going to give you an instruction at the end about how

41

you may use that evidence and how you may not use that evidence. And it will be part of the instructions at the conclusion of the case."

At the conclusion of the investigator's testimony and outside of the jury's presence, the court stated that it permitted the evidence of the Facebook searches based on the information that defendant lived at the address associated with the Facebook account, which was also George's address and the address that defendant gave when arrested. The court continued, "I think that raises the inference . . . as to who accessed that Facebook account and did those searches. [¶] And based on that, I'm allowing the admissibility, over objection and after consideration of Evidence Code 352."

### 2. Legal Principles and Standard of Review

As we stated above, all relevant evidence is generally admissible (Evid. Code, § 351), and evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action" (*id.*, § 210). Relevant evidence must be excluded "when its probative value is *substantially* outweighed by its prejudicial effect." (*Tran*, *supra*, 51 Cal.4th at p. 1047; Evid. Code, § 352.)

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. (*Waidla*, *supra*, 22 Cal.4th at p. 723.) Thus, we will not find error unless the court "exercised its discretion in an arbitrary, capricious, or patently absurd manner." (*Thomas*, *supra*, 53 Cal.4th at p. 806.)

### 3. Analysis

#### a. Evidence of Internet Searches for News Stations and Jackson Shortly After the Shooting

Defendant contends that the evidence of internet searches by the George Thompson Jr. Facebook account for news stations on the date of the shooting and for Jackson within days of the shooting was not relevant because it was not reasonable to infer that the searches were conducted "only because [he] was the shooter; this theory was wildly speculative." Defendant points out that there was no evidence that he "went home or stayed with [George]

42

after the shooting"; that he had access to the Facebook account; that George had not learned about the shooting from someone else; or that he had simply told George about the shooting because he was in the vicinity of the shooting that night.

We conclude that the trial court did not abuse its " 'broad discretion' " when it implicitly determined that evidence that a Facebook account associated with defendant's home address conducted three searches for news stations at 3:37 a.m., 3:38 a.m., and 3:46 a.m. on the date of the shooting was relevant to defendant's identity as the shooter. (*Tully*, *supra*, 54 Cal.4th at p. 1010.) Although circumstantial and not overwhelmingly convincing, " ' "the evidence tend[ed] ' "logically, naturally, and by reasonable inference" to establish [defendant's] identity' " ' " as the shooter because the searches occurred just over an hour after the shooting, were clustered together, and were highly unusual for the account. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1058 (*Wallace*).) The timing of the searches, that there were multiple searches, and the atypical nature of the searches for the account evinced that they were more than just a casual search for news.

The same holds true for the evidence of the account's "many searches" for Jackson a couple of days after the shooting on the same date Jackson's name appeared in a news article and the single search for " 'Marvin Jackson Jr. San Jose CA' " six days after the shooting. That there were other reasonable inferences that could be taken from the evidence "do[es] not mean the [searches] ha[d] *no* tendency in reason to establish that defendant shot [Jackson]. Those issues affect the probative weight of the evidence, not whether the [evidence] meet[s] the threshold requirement of relevancy." (*People v. Alexander* (2010) 49 Cal.4th 846, 904; see also *People v. Farnam* (2002) 28 Cal.4th 107, 156-157 [" 'Standing alone the inference may have been weak, but that does not make the evidence irrelevant.' "].)

Defendant contends that even if relevant, the evidence of the Facebook searches conducted shortly after the shooting was more prejudicial than probative because it was

"wildly speculative"; the prosecution relied on it in closing argument; and it connected him to George's witness intimidation.

We determine that although the probative value of the search evidence was somewhat minimal, it was not "*substantially* outweighed by its prejudicial effect." (*Tran*, *supra*, 51 Cal.4th at p. 1047.) The evidence was not particularly inflammatory, and defense counsel directly countered the prosecution's argument that the evidence demonstrated consciousness of guilt and defendant's identity as the shooter. Counsel asserted in closing "that [the] whole thing about the searches the day or two after the homicide -- we don't know who did them," and that even if defendant had performed the searches, it did not mean that he was the shooter because "[w]e know that [defendant] was down there." And we must reject defendant's claim that this search evidence somehow connected him to George's witness intimidation, as the trial court explicitly instructed the jury that "[t]here has been no evidence presented linking this [witness intimidation] conduct to the defendant and you may not use that evidence against the defendant in any way." (See *Flinner*, *supra*, 10 Cal.5th at p. 717 ["we presume [the jury] followed the court's instructions"].)

For these reasons, we conclude that the trial court did not abuse its discretion when it admitted the evidence of the internet searches for news stations and for Jackson conducted on the George Thompson Jr. Facebook account shortly after the shooting.

### b. Evidence of Searches Related to Owens After Preliminary Hearing

Defendant contends that the evidence of the Facebook searches related to Owens in April 2016 should have been excluded as irrelevant and as more prejudicial than probative because they did not corroborate George's intimidation of Owens; no corroboration of George's intimidation of Owens was necessary; and there was no evidence that Owens was aware of the searches such that they were intimidating to him.

As we recounted above, the trial court admitted evidence that George engaged in acts of witness intimidation against Owens, finding that the evidence was relevant to Owens's

credibility. Evidence was presented that on April 3, 2016, the George Thompson, Jr. Facebook account posted a photograph of Owens testifying at the preliminary hearing with the comment, " 'Some snitch who on the stand testify.' " A later comment posted by the account stated, " 'He got that ET Finger. Hashtag stop snitching.' " There was evidence that George had attended the hearing and that the photograph was taken from the area where George was sitting. At issue here is the evidence that the same Facebook account searched for Owens by his nickname, " 'Wizzy,' " and " 'Wizzy Going' " a total of four times between April 5 and April 8.

Contrary to defendant's assertion, evidence that the George Thompson, Jr. Facebook account searched for Owens multiple times around when the account posted the photograph of Owens testifying does tend to corroborate that George was involved in the intimidation of Owens. " ' "[T]he evidence tend[ed] ' "logically, naturally, and by reasonable inference" ' " ' " to establish that George was involved in the intimidation because the Facebook account was linked to George and it shows George's persistent interest in Owens. (*Wallace*, *supra*, 44 Cal.4th at p. 1058.) Importantly, " ' " "[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to [his] credibility and is well within the discretion of the trial court. [Citations.]' " [Citation.] "Moreover, evidence of a 'third party' threat may bear on the credibility of the witness, whether or not the threat is directly linked to the defendant." ' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1313.)

Defendant argues that the searches for Owens should have been excluded as more prejudicial than probative because "[t]heir minimal corroborative value as to the witness intimidation was substantially outweighed by the implication that George was getting highly involved with several witnesses and that he may have been doing his brother's bidding." As we have stated several times, however, the trial court instructed the jury regarding "conduct associated with George Thompson . . . attempting to influence Khalil Ow[en]s" that "[t]here

has been no evidence . . . linking this [witness intimidation] conduct to the defendant and you may not use that evidence against the defendant in any way." We presume that the jury followed that instruction. (*Flinner*, *supra*, 10 Cal.5th at p. 717.) While defendant asserts that there was "a real risk" that the Facebook search evidence "could have been credited against [him]," as the jury instruction did not specify that it pertained to the Facebook searches, the trial court told the jury during the investigator's testimony, "You've heard evidence related to a photograph of Mr. Owens and conduct relating to 'hashtag snitch' -- evidence of that sort. I'm going to give you an instruction at the end about how you may use that evidence and how you may not use that evidence. And it will be part of the instructions at the conclusion of the case." This mid-testimony admonishment sufficiently grouped the evidence together such that it would have been clear to the jury that the subsequent instruction covered the George Thompson, Jr. Facebook account searches for Owens.

Defendant has not demonstrated that the probative value of the Facebook account searches for Owens was "*substantially* outweighed by its prejudicial effect." (*Tran*, *supra*, 51 Cal.4th at p. 1047.) The evidence of the searches for Owens was not inflammatory, especially given the evidence that the account had previously posted a photograph of Owens testifying and comments about being a " 'snitch' " and " 'snitching.' " Nor was it cumulative to the extent that the trial court abused its discretion for failing to exclude it on that basis. (See *Booker*, *supra*, 51 Cal.4th at p. 194 [a trial court must exclude "unduly cumulative" evidence].)

For these reasons, we conclude that the trial court did not err when it admitted the evidence of the George Thompson Jr. Facebook account's internet searches for Owens.

### c. Due Process

Defendant further contends that the admission of the internet searches conducted on the George Thompson, Jr. Facebook account violated his right to due process under the federal Constitution. However, since we have not found that the admission of the evidence

46

was error under state law, we need not decide "the consequences of that error, including . . . whether the error was so serious as to violate due process." (*Partida*, *supra*, 37 Cal.4th at p. 437.)

### E.    *Cumulative Prejudice*

Defendant contends that his convictions must be reversed due to cumulative prejudice from the trial court's errors, which denied him a trial that comported with due process. "We have considered each claim on the merits, and neither singly nor cumulatively do they establish prejudice requiring the reversal of the convictions." (*People v. Lucas* (1995) 12 Cal.4th 415, 476.)

### F.    *Prior Prison Term Enhancement*

The parties agree that the prior prison term enhancement must be stricken based on a recent change to the law. We concur.

Effective January 1, 2020, Senate Bill No. 136 (2019-2020 Reg. Sess.) amended the prior prison term sentence enhancement under section 667.5, subdivision (b) by limiting its application to prison terms that, unlike defendant's, were served for a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b). (Stats. 2019, ch. 590, § 1.) The amendment applies retroactively to defendant because it is an ameliorative change, there is no indication that the Legislature intended the amendment to apply solely prospectively, and defendant's case is not yet final on appeal. (See *People v. Jennings* (2019) 42 Cal.App.5th 664, 680-682.) We will therefore order the trial court to strike the section 667.5, subdivision (b) sentence enhancement.

### G.    *Firearm Enhancement*

Defendant contends that the matter must be remanded for resentencing to allow the trial court to exercise its newly enacted discretion to strike the section 12022.53, subdivision (d) firearm enhancement. Defendant asserts that the trial court may also reduce his punishment by imposing a lesser included firearm enhancement. The Attorney General

concedes that the case should be remanded for the court to exercise its discretion to strike the enhancement.

"Section 12022.53 sets forth the following escalating additional and consecutive penalties, beyond that imposed for the substantive crime, for use of a firearm in the commission of specified felonies . . . : a 10-year prison term for personal use of a firearm, even if the weapon is not operable or loaded (*id.*, subd. (b)); a 20-year term if the defendant 'personally and intentionally discharges a firearm' (*id.*, subd. (c)); and a 25-year-to-life term if the intentional discharge of the firearm causes 'great bodily injury' or 'death, to any person other than an accomplice' (*id.*, subd. (d))." (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1124.)

Effective January 1, 2018, Senate Bill No. 620 (2017-2018 Reg. Sess.) amended section 12022.53, subdivision (h) to give trial courts discretion to strike or dismiss a section 12022.53 firearm enhancement at sentencing in the interests of justice. (Stats. 2017, ch. 682, § 2.) Prior to the amendment, imposition of the enhancement was mandatory. (See former § 12022.53, subd. (h); Stats. 2010, ch. 711, § 5.) We concur with the parties that as an ameliorative change to the law, the amendment to section 12022.53 applies retroactively to cases that are not yet final on appeal. (See *People v. Woods* (2018) 19 Cal.App.5th 1080, 1090-1091.)

After the amendment to section 12022.53, subdivision (h), *People v. Morrison* (2019) 34 Cal.App.5th 217, 223 (*Morrison*) held that trial courts have "discretion to impose an enhancement under section 12022.53, subdivision (b) or (c) as a middle ground to a lifetime enhancement under section 12022.53, subdivision (d), if such an outcome [is] found to be in the interests of justice under section 1385." A split developed in the Courts of Appeal regarding whether a trial court had the discretion to impose a lesser uncharged section 12022.53 enhancement.

In *People v. Tirado* (2022) 12 Cal.5th 688, 697 (*Tirado*), the California Supreme Court recently concluded that *Morrison* "correctly described the scope of a trial court's

sentencing discretion under section 12022.53." *Tirado* determined that the "statutory framework" of section 12022.53, as amended by Senate Bill No. 620, "permits a court to strike the section 12022.53(d) enhancement found true by the jury and to impose a lesser uncharged statutory enhancement instead." (*Tirado*, *supra*, at p. 692.) "When an accusatory pleading alleges and the jury finds true the facts supporting a section 12022.53(d) enhancement, and the court determines that the section 12022.53(d) enhancement should be struck or dismissed under section 12022.53(h), the court may, under section 12022.53(j), impose an enhancement under section 12022.53(b) or (c)." (*Id.* at p. 700.) "[T]he Legislature has permitted courts to impose the penalties under section 12022.53(b), (c), or (d) so long as the existence of facts required by the relevant subdivision has been alleged and found true." (*Id.* at p. 702.)

The remaining question then is whether remand is required or if it would be an " 'idle act.' " (*People v. Gamble* (2008) 164 Cal.App.4th 891, 901 (*Gamble*).) Generally, "when the record shows that the trial court proceeded with sentencing on the . . . assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing." (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.) The rationale for this general rule is that "[d]efendants are entitled to 'sentencing decisions made in the exercise of the "informed discretion" of the sentencing court,' and a court that is unaware of its discretionary authority cannot exercise its informed discretion." (*Ibid.*) However, where " 'the record shows that the trial court would not have exercised its discretion even if it believed it could do so, then remand would be an idle act and is not required.' " (*Gamble*, *supra*, at p. 901; see also *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391 [remand for resentencing is appropriate "unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion' "].)

Here, the trial court did not elaborate on its sentencing decisions. It simply stated that probation was denied and defendant was committed for 75 years to life consecutive to

49

one year.  When asked to break down the sentence, the court stated, "25 to life for the first degree murder, . . . doubled to 50 to life because of the strike prior.  [¶]  25 years added for the gun enhancement pursuant to 12022.53, for 75 years to life.  [¶]  The gun possession charge in Count Two is the mid term of four years concurrent, and then the prison prior is one year consecutive pursuant to 667.5(b), for a total term of 75 years to life consecutive to one year."  Because there is no indication from the record " 'that the trial court would not have exercised its discretion even if it believed it could do so," remand is required.  (*Gamble*, *supra*, 164 Cal.App.4th at p. 901.)

Accordingly, we will remand the matter to give the trial court an opportunity to exercise its discretion to strike the section 12022.53, subdivision (d) firearm enhancement or to impose a lesser enhancement under section 12022.53, subdivision (b) or (c).  We express no opinion on how the trial court should exercise its discretion on remand.

### H.    *Criminal Justice Administration Fee*

Defendant contends that there is insufficient evidence to support the trial court's imposition of a $129.75 criminal justice administration fee pursuant to Government Code sections 29550, 29550.1, and 29550.2, also known as the booking fee.  Because the court specified that the fee was to be paid to the city of San Jose, we presume that the statutory basis for the fee was former Government Code section 29550.1, which stated that "[a]ny city . . . whose officer or agent arrests a person is entitled to recover any criminal justice administration fee imposed by a county from the arrested person if the person is convicted of any criminal offense related to the arrest."  Defendant argues that imposition of the fee was improper because there was no evidence that he was arrested or booked by the San Jose Police Department.

Assembly Bill No. 1869 "abrogated the authority to impose and collect . . . the criminal justice administration fee."  (*People v. Greeley* (2021) 70 Cal.App.5th 609, 626 (*Greeley*).)  Newly enacted Government Code section 6111 provides that "[o]n and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to . . . subdivision (c)

or (f) of Section 29550, and Sections 29550.1, 29550.2, and 29550.3 . . . is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Gov. Code, § 6111, subd. (a).) In other words, "by its plain terms," Government Code section 6111 "make[s] any unpaid portion of the identified assessments, as they existed on June 30, 2021, 'unenforceable and uncollectible' as of July 1, 2021. [Citation.]" (*Greeley*, *supra*, at p. 626.) Further, "the statute . . . mandates that any portion of a judgment imposing those fees be vacated." (*Id.* at pp. 626-627, fns. omitted.)

Accordingly, pursuant to Government Code section 6111, the unpaid balance of the criminal justice administration fee must be vacated, rendering moot defendant's sufficiency of the evidence claim. (See *Eye Dog Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541 [if no effectual relief can be granted, an appeal will be dismissed as moot].) Although defendant asserts that he is entitled to reimbursement for "any booking fee" that he has already paid, there is no evidence in the record that defendant has paid any portion of the fee. Because this case must be remanded for resentencing, defendant may raise this argument in the trial court in the first instance.

## I.     *Restitution Order*

Defendant contends that insufficient evidence supports $5,000 of the $13,083 in direct victim restitution he was ordered to pay Jackson's parents. According to the probation report, the parents requested $5,000 to reimburse them for the outstanding balance they paid on Jackson's car. Defendant argues that there is insufficient evidence to support the $5,000 ordered for the vehicle payment because Jackson's parents did not suffer a financial loss; "they gained a car." Defendant also contends that the order was improper because "the outstanding debt was not caused by the crime." Defendant asserts that to the extent counsel's objection to the $5,000 in restitution did not preserve his claim, he received ineffective assistance of counsel. The Attorney General contends that the claim has been forfeited because defendant did not request a restitution hearing and that defendant has not shown that his trial counsel was ineffective.

51

### 1. Trial Court Proceedings

The probation report stated that Jackson's parents "had to pay the remaining balance of $5,000 on [Jackson's] vehicle," and requested direct victim restitution to reimburse them for that payment as well as funeral expenses.

Defendant objected to the requested restitution for the car, asserting that he did not know if that was "an appropriate item for restitution" because "[t]he vehicle probably remained in the [family's] custody and control."

The trial court ordered defendant to pay $13,083 to Jackson's parents and advised defendant that he had "a right to a hearing to contest that amount." The court also ordered defendant to pay $5,000 to the California Victim Compensation Board. The written restitution order pertains solely to the board's restitution.

It does not appear from the record that defendant requested a restitution hearing.

### 2. Relevant Legal Principles Regarding Victim Restitution

Section 1202.4 provides that "a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime." (§ 1202.4, subd. (a)(1).) A "victim" includes the victim's parents. (*Id.*, subd. (k)(3)(A).) Absent two inapplicable exceptions, "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim . . . in an amount established by court order, based on the amount of loss claimed by the victim . . . or any other showing to the court." (*Id.*, subd. (f).) The restitution ordered "shall be of a dollar amount that is sufficient to fully reimburse the victim . . . for every determined economic loss incurred as the result of the defendant's criminal conduct." (*Id.*, subd. (f)(3).)

### 3. Forfeiture

On this record, we determine that defendant has forfeited his claim challenging the $5,000 in direct victim restitution ordered to reimburse Jackson's parents for the outstanding debt they paid on Jackson's car. The trial court was entitled to rely on the probation report

as the basis for the parents' claimed $5,000 loss. (See *People v. Lockwood* (2013) 214 Cal.App.4th 91, 96; § 1202.4, subd. (f).) Given that defendant did not request a restitution hearing, the court had no basis to deny the requested restitution as " ' " '[s]ection 1202.4 does not, by its terms, require any particular kind of proof' " ' " (*People v. Weatherton* (2015) 238 Cal.App.4th 676, 684) and victim restitution is mandatory (§ 1202.4, subd. (a)(1)).

Defendant couches his claim in terms of insufficiency of the evidence, which generally can be raised for the first time on appeal (see *People v. McCullough* (2013) 56 Cal.4th 589, 596), but the arguments defendant makes in support of the claim belie that description. Defendant argues that he did not cause the car debt and that the $5,000 in restitution was a windfall because the parents also got to keep the car. A sufficiency of the evidence challenge, in contrast, maintains that the evidence in the record does not support the judgment (see *People v. Westerfield* (2019) 6 Cal.5th 632, 713), an argument defendant does not make.

That defendant forfeited his claim is demonstrated by the lacking factual support in the record for his arguments. For example, without a restitution hearing, there is no basis to conclude that the $5,000 in restitution constituted a windfall as there is no information regarding the value of the car at the time of Jackson's death. Nor is there any evidence regarding the car loan that would clarify whether Jackson's death obligated Jackson's parents to pay the outstanding balance.

For these reasons, we conclude that defendant has forfeited his challenge to the restitution order by failing to request a restitution hearing. (Cf. *People v. Holloway* (2004) 33 Cal.4th 96 133 ["A tentative pretrial evidentiary ruling, made without fully knowing what the trial evidence would show, will not preserve the issue for appeal if the appellant could have, but did not, renew the objection or offer of proof and press for a final ruling in the changed context of the trial evidence itself"].)

### 4. Ineffective Assistance of Counsel

Defendant contends that if the claim has been forfeited, he received ineffective assistance of counsel. As explained above, to prevail on an ineffective assistance of counsel claim, a defendant must establish both that his or her counsel's performance was deficient and that he or she suffered prejudice. (*Strickland*, *supra*, 466 U.S. at p. 687.) Defendant has not demonstrated either deficient performance or prejudice here.

Regarding deficient performance, reversal on direct appeal is warranted only if "(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*Mai*, *supra*, 57 Cal.4th at p. 1009.) Because the record does not reveal why counsel failed to request a restitution hearing to contest the order to reimburse Jackson's parents for the car debt, we cannot conclude that counsel was deficient as there are satisfactory explanations for the failure.

Similarly, regarding prejudice, without any facts about the car loan, ownership, or value in the record, defendant cannot "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.)

### J. *Imposition of Fines and Fees*

Relying primarily on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), which was decided after defendant was sentenced, defendant claims that the trial court's imposition of a $10,000 restitution fine (§ 1202.4, subd. (b)), an $80 court operations assessment (§ 1465.8), a $60 court facilities assessment (Gov. Code, § 70373), and a $129.75 criminal justice administrative fee (Gov. Code, § 29550.1)[10] and its stayed imposition of a $10,000 parole revocation restitution fine (§ 1202.45) violated the due process, equal protection, and excessive fines clauses of the federal and state Constitutions

---

[10] As stated above, any outstanding balance on the criminal justice administrative fee must be vacated pursuant to Government Code section 6111.

because defendant lacked the ability to pay. Defendant further contends that the court abused its discretion and violated his due process rights when it imposed a restitution fine in excess of the statutory minimum. In response, the Attorney General suggests that we allow defendant to request a hearing on his inability to pay on remand.

### 1. Trial Court Proceedings

At sentencing, defendant asked the court to impose the mandatory minimum restitution fine, which was $300. Defendant stated that "he's been somewhat unemployed and certainly he will be in custody for the rest of his life and . . . would ask the court not to tax his family or anyone else with the restitution amount [*sic*]," and asserted that it was within the court's discretion to impose the mandatory minimum.

The probation report stated that defendant has three children. At the time of his arrest, defendant had been working as a stocker for a month. His longest stretch of employment was three months as a landscaper in 2014 before a separate arrest. Defendant also had experience as a janitor. The report recommended the statutory maximum restitution fine of $10,000.

The court ruled: "Despite the request of the defendant, I'm going to order a $10,000 restitution fund fine under the formula permitted by . . . Section 1202.4(b)(2)." The court imposed the assessments described above and imposed and stayed a $10,000 parole revocation fund fine.

### 2. *Dueñas* Inability to Pay Claim

In *Dueñas*, the court held that the imposition of a court operations assessment and a court facilities assessment without a determination of the defendant's ability to pay was "fundamentally unfair" and violated due process under the federal and state Constitutions. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1168.) The court also concluded that the execution of a restitution fine under section 1202.4 "must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas*, *supra*, at p. 1164.)

As we explained above, we must remand the matter to give the trial court an opportunity to exercise its newly enacted discretion on the section 12022.53 firearm enhancement. Because the Attorney General has no objection to defendant raising his *Dueñas* claim on remand, we will allow defendant to raise the claim before the trial court on remand. (See *People v. Castellano* (2019) 33 Cal.App.5th 485, 490.) Although defendant asserts in his reply brief that "remand is unnecessary since the appellate record indicates an inability to pay," the record is undeveloped as defendant did not request an ability to pay determination below. Nor do we generally make factual findings in the first instance. Thus, remand on defendant's *Dueñas* claim is appropriate.

### 3. Abuse of Discretion in Imposition of Restitution Fine

Defendant contends that the trial court abused its discretion and violated his due process rights when it imposed a restitution fine above the statutory minimum because he "made it clear that he lacked the ability to pay a restitution fine in excess of the minimum amount" and the court was "unaware that prisoners do not have the assumed ability to pay, and it failed to properly consider departing from the statutory formula in light of [his] inability to pay." Defendant highlights the information in the probation report regarding his three children and employment history to support his claim.

As defendant recognizes, however, a trial court has broad discretion to set the amount of the restitution fine. (§ 1202.4, subd. (b)(1); see also *People v. Urbano* (2005) 128 Cal.App.4th 396, 405 (*Urbano*).) The court may impose the restitution fine in any amount between $300 and $10,000, "commensurate with the seriousness of the offense." (§ 1202.4, subd. (b)(1).)

In setting the amount above the statutory minimum, "the court shall consider any relevant factors, including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved in

the crime." (§ 1202.4, subd. (d).)  The court may also "determine the amount of the fine as the product of the minimum fine . . . multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted." (§ 1202.4, subd. (b)(2).)  The court is not required to hold a hearing or state its findings for the record unless it declines to impose the fine.  (§ 1202.4, subds. (b) & (d); *Urbano*, *supra*, 128 Cal.App.4th at pp. 405-406.)

The trial court was aware through its review of the probation report that defendant had three kids and a limited employment history.  And, certainly, the court was cognizant of the fact that it ordered defendant to pay $13,083 in direct victim restitution.  Nonetheless, it was within the court's discretion to order the maximum restitution fine based on the permissive statutory formula, which here calculates to an amount well above the statutory maximum ($22,800).  (§ 1202.4, subd. (b)(1), (2).)  Moreover, the court made it clear when it imposed the maximum fine that it had considered defendant's request for the minimum, and "express findings by the court as to the factors bearing on the amount of the fine are not required." (*People v. Avila* (2009) 46 Cal.4th 680, 729.)  For those reasons, we reject defendant's claim that the trial court abused its discretion when it imposed the maximum restitution fine.  Nor has defendant shown that the court relied on unreliable or inaccurate facts such that its imposition of the fine violated the due process clause.  (See *United States v. Tucker* (1972) 404 U.S. 443, 447-448.)

**K.     *Strike Allegation Based on Juvenile Adjudication***

Defendant contends that the prior strike allegation based on his juvenile adjudication of aggravated kidnapping (§ 209.5) violated his right to a jury trial under the federal and state Constitutions because he had no right to a jury trial in the juvenile proceeding. Defendant also contends that the use of the adjudication violated his jury trial rights because

a jury did not find that section 667, subdivision (d)(3)'s requirements for a juvenile adjudication to qualify as a strike were met.[11]

### 1. Trial Court Proceedings

Defendant waived his right to a jury trial on the prior strike allegation, which was based on his adjudication of aggravated kidnapping. At the conclusion of the court trial on the allegation, the court found beyond a reasonable doubt that defendant "suffered a juvenile adjudication, pursuant to Welfare and Institution Code Section 602, for an offense listed in Welfare and Institutions Code Section 707(b), . . . kidnapping for the purpose of robbery, Penal Code Section 209.5, Santa Clara County Superior Court Case Y90681, and th[at] defendant committed the offense when he was 16 years old or older." Based on its finding, the trial court doubled the sentence imposed on count 1.

### 2. Legal Principles

The Three Strikes law "prescribes increased punishment for a person who is convicted of a felony after sustaining one or more qualifying prior felony convictions or juvenile adjudications, which are commonly known as strikes." (*People v. Barragan* (2004) 32 Cal.4th 236, 239.) "A qualifying juvenile adjudication must be pleaded and proved beyond a reasonable doubt [citations], and the defendant has a statutory right to jury trial on the issue of whether he or she suffered the prior adjudication [citations]." (*People v. Smith* (2003) 110 Cal.App.4th 1072, 1079.)

In *People v. Nguyen* (2009) 46 Cal.4th 1007, 1010 (*Nguyen*), the California Supreme Court addressed whether the federal Constitution allows the use of a juvenile adjudication as a prior strike even though there is no right to a jury trial in the juvenile proceeding. "A

---

[11] Section 667, subdivision (d)(3) provides that a juvenile adjudication qualifies as a prior strike if the juvenile was at least 16 years old at the time of the offense; the offense is listed in Welfare and Institutions Code 707, subdivision (b) or described in paragraph (1) or (2) as a serious or violent felony; the juvenile was found fit to be dealt with under the juvenile court law; and the juvenile was adjudged a ward of the juvenile court. (See also 1170.12, subd. (b)(3).)

series of United States Supreme Court decisions, beginning with *Apprendi v. New Jersey* (2000) 530 U.S. 466 [(*Apprendi*)], establishes an adult criminal defendant's general right . . . to a jury finding beyond reasonable doubt of any fact used to increase the sentence for a felony conviction beyond the maximum term permitted by conviction of the charged offense alone." (*Nguyen*, *supra*, at p. 1010.) However, the United States Supreme Court excepted from *Apprendi*'s general rule "the fact of a prior conviction," which may properly be determined by the sentencing court. (*Apprendi*, *supra*, at p. 490.) Thus, the California Supreme Court held in *Nguyen* that "*Apprendi* does not bar the use of a constitutionally valid, fair, and reliable prior adjudication of criminal conduct to enhance a subsequent adult sentence simply because the prior proceeding did not include the right to a jury trial." (*Nguyen*, *supra*, at p. 1025.) "[T]he absence of a constitutional or statutory right to jury trial under the juvenile law does not, under *Apprendi*, preclude the use of a prior juvenile adjudication of criminal misconduct to enhance the maximum sentence for a subsequent adult felony offense by the same person." (*Nguyen*, *supra*, at p. 1028.)

More recently, in *People v. Gallardo* (2017) 4 Cal.5th 120 (*Gallardo*), the California Supreme Court held that "[u]nder the Sixth Amendment to the United States Constitution, as interpreted in *Apprendi* . . . , any fact, other than the fact of a prior conviction, that increases the statutorily authorized penalty for a crime must be found by a jury beyond a reasonable doubt." (*Id.* at p. 123.) " 'The Sixth Amendment contemplates that a jury—not a sentencing court—will find' the facts giving rise to a conviction, when those facts lead to the imposition of additional punishment under a recidivist sentencing scheme. [Citation.]" (*Id.* at p. 134.)

Nonetheless, the court reaffirmed "that determinations about the nature of prior convictions are to be made by the [sentencing] court, rather than a jury, based on the record of conviction." (*Gallardo*, *supra*, 4 Cal.5th at p. 138; see also *People v. McGee* (2006) 38 Cal.4th 682, 695 ["there has been a clear expression of legislative intent that a jury play a very limited role in determining prior offense allegations and that a court, not a jury,

59

examine records of prior convictions to determine whether the conviction alleged qualifies as a conviction under the applicable sentence-enhancement provision"], overruled on another point in *Gallardo*, *supra*, at p. 134.)

### 3. Lack of Jury Trial Right in Juvenile Proceedings

Relying primarily on the United States Supreme Court cases *Descamps v. United States* (2013) 570 U.S. 254 (*Descamps*) and *Mathis v. United States* (2016) 579 U.S. 500 (*Mathis*), as well as the California Supreme Court's decision in *Gallardo*, *supra*, 4 Cal.5th 120, defendant urges us to determine that the use of his juvenile adjudication as a prior strike violated his constitutional rights to a jury trial because he had no right to a jury trial in the juvenile proceeding. We conclude otherwise.

In both *Descamps* and *Mathis*, the United States Supreme Court interpreted the federal Armed Career Criminal Act (18 U.S.C. § 924(e)) in light of the Sixth Amendment's limits on judicial factfinding recognized in *Apprendi*. Both cases involved the sentencing courts' determinations that the alleged prior convictions qualified as predicate offenses to enhance subsequent sentences under the Act. (*Descamps*, *supra*, 570 U.S. at p. 257; *Mathis*, *supra*, 579 U.S. at p. 503.) The Supreme Court concluded that the sentencing courts were generally barred from looking beyond the statutory elements of the prior offenses to determine whether the defendants' conduct qualified for the imposition of a sentence enhancement under the Act. (See *Descamps*, *supra*, at pp. 259, 268-269 [sentencing court impermissibly relied on plea colloquy to find defendant's prior conviction for burglary involved unlawful entry]; *Mathis*, *supra*, at pp. 507-509 [sentencing court impermissibly relied on records of prior conviction to determine that defendant had burglarized structures rather than vehicles].) Importantly, neither case involved the constitutional validity of using a prior juvenile adjudication to enhance a sentence when the offender did not have the right to a jury trial in the juvenile proceeding.

Similarly, in *Gallardo*, the California Supreme Court limited the scope of permissible factfinding by a sentencing court in determining whether the defendant suffered a qualifying

prior conviction. (*Gallardo*, *supra*, 4 Cal.5th at p. 134; see *id.* at p. 126 [the sentencing court found the defendant's assault conviction qualified as a prior strike based on the facts adduced at the preliminary hearing that the defendant used a deadly weapon].) The court did not overrule *Nguyen*'s holding that a sentencing court may validly impose a sentence enhancement based on a defendant's prior juvenile adjudication despite the lack of a jury trial right in the juvenile proceeding. Thus, *Nguyen* remains controlling precedent that a juvenile adjudication can constitutionally qualify as a prior strike despite the lack of a jury trial right in the juvenile proceeding. (See *People v. Romero* (2019) 44 Cal.App.5th 381, 389 [*Gallardo* did not "call[] into question *Nguyen*'s holding that a sentencing court may impose a sentence enhancement based on a prior juvenile adjudication, despite the lack of a right to a jury trial in that proceeding"].) We are bound by *Nguyen*. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Accordingly, pursuant to *Nguyen*, we determine that the use of defendant's juvenile adjudication as a prior strike to enhance defendant's sentence did not violate defendant's rights to a jury trial despite that defendant had no right to a jury trial in the juvenile proceeding. (See *Nguyen*, *supra*, 46 Cal.4th at p. 1025.)

### 4. Lack of Jury Findings that the Adjudication Qualified as a Strike

Defendant contends that his jury trial rights were also violated because "[a] jury could only determine whether [he] was adjudicated to have committed an aggravated kidnapping when a juvenile. The jury was not permitted to find the other elements necessary [under section 667, subdivision (d)(3)] for this to be a strike."

However, as the Attorney General points out, defendant waived his right to a jury trial on the prior strike allegation, so it was the trial court, not a jury, that made all the findings regarding the truth of the prior strike allegation. Thus, defendant cannot claim here that a jury should have determined whether section 667, subdivision (d)(3)'s requirements were met. Moreover, the California Supreme Court reaffirmed in *Gallardo* that

determinations pertaining to the nature or basis of a prior conviction are made by the sentencing court. (*Gallardo*, *supra*, 4 Cal.5th at p. 138.)

For these reasons, we reject defendant's challenges to the trial court's prior strike finding based on defendant's juvenile adjudication for aggravated kidnapping.

## IV.    DISPOSITION

The judgment is reversed and the matter is remanded for resentencing. On remand, the trial court is directed to strike the prior prison term enhancement (Pen. Code, § 667.5, subd. (b)). The court shall also consider whether to exercise its discretion to strike the firearm enhancement (Pen. Code § 12022.53, subd. (d)) or to impose a lesser firearm enhancement (Pen. Code, § 12022.53, subds. (b), (c)). Finally, the court shall vacate the portion of the $129.75 criminal justice administration fee (Gov. Code, § 29550 et seq.) that remained unpaid as of July 1, 2021 (see Gov. Code, § 6011).

On remand, defendant may raise his claim pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 that he is unable to pay the imposed fines and fees. Defendant may also raise his claim that he is entitled to the reimbursement of any portion of the criminal justice administration fee that he has already paid because the fee was unauthorized.

_____<br>BAMATTRE-MANOUKIAN, ACTING P.J.

I CONCUR:

_____
WILSON, J.

*People v. Thompson*
H044699

Lie, J., Concurring in the Judgment:

" 'The way to stop discrimination on the basis of race is to speak openly and candidly on the subject of race, and to apply the Constitution with eyes open to the unfortunate effects of centuries of racial discrimination.' " (Stats. 2020, ch. 317, § 2, subd. (c) (Assem. Bill No. 2542 (2019-2020) Reg. Sess.)), quoting *Schuette v. Coalition to Defend Affirmative Action, Integration and Immigrant Rights and Fight for Equality By Any Means Necessary* (2014) 572 U.S. 291, 380-381 (2014) (dis. opn. of Sotomayor, J.).) I join the majority's analysis in sections III.C-III.D and III.F-III.I (Maj. opn., *ante*, pp. 27-46 & 46-47) and its disposition of Gregory Jermaine Thompson's appeal. I write separately on the dual issues of racial bias raised during jury selection—(1) the dismissal of prospective juror Y.B., due in part to his concerns regarding systemic and implicit bias, and (2) the prosecutor's reference to the fable of the scorpion and frog—particularly as they relate to the selective resistance to speaking openly about race where necessary. Like the majority, I disagree with Thompson's characterization of these as structural error. I further conclude that the cumulative errors were harmless under any standard, given the strength of the evidence at trial, particularly the testimony of Jessie Gulley and its circumstantial corroboration by the surveillance video and the gunshot wound to his hand. But irrespective of the lack of actionable prejudice to Thompson's prospects for a more favorable verdict on this record, the handling of these issues during jury selection amplified rather than mitigated the same systemic and implicit bias of which the trial court was unmistakably dubious.

I. *"Cause" to Dismiss a Juror for Acknowledging Structural and Implicit Bias*

I respectfully disagree with the majority's decision to treat as forfeited Thompson's claim of error regarding the dismissal of Y.B. To my mind, Thompson adequately preserved his claim on this record.[12] Moreover, even if Thompson had not

---

[12] When Thompson's counsel declined to stipulate to Y.B.'s being excused for cause and asked to question him further, the trial court stated, "I'm going to excuse him

preserved the claim, the doctrine of forfeiture is not mandatory.  (*In re Sheena K.* (2007) 40 Cal.4th 875, 887-888, fn. 7.)  Where, as here, the response to a prospective juror's acknowledgement of systemic bias is incredulity and dismissal, I believe we have an obligation to say plainly:  Recognizing systemic bias does not make a person unfit to serve as a juror.  (See, e.g., Stats. 2019, ch. 418, § 1 (Assem. Bill 242 (2019-2020 Reg. Sess.)); Code. Civ. Proc., § 231.7, subd. (d)(2)(A) ["an objectively reasonable person is aware that unconscious bias, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors"]; *id.*, § 231.7, subd. (e) [peremptory challenge based on "belief that law enforcement officers engage in racial profiling or that criminal laws have been enforced in a discriminatory manner" is presumptively invalid]; see also Kang et al., *Implicit Bias in the Courtroom* (2012) 59 UCLA L.Rev. 1124, 1136-1137 [implicit bias among police] 1142 [among jurors, prosecutors, and defense counsel], 1146 [among judges].)

Accordingly, the trial court erred in treating Y.B.'s statement that "it is difficult" for a Black person to have a fair trial as legal cause to excuse him.  (Cf., Code Civ. Proc., §§ 225, subd. (b)(1), 228, 229.)  To be sure, Thompson had no entitlement to Y.B.'s

_____

for cause at this time, then.  [¶] Thank you.  [¶] I -- I really don't want that influencing the rest of the jury."  The court agreed to permit counsel to inquire only once she confirmed her intention to do so before the court permitted the panel to return.  When counsel told Y.B. she was sorry the court was going to excuse him, stated her reasons for believing he would be a good juror, and said to the judge, "I know what you're going to do, Your Honor," the court scolded her for the manner of her comment—"mak[ing] a statement in a – in a question to a juror" rather than in an objection.  But the court did nothing to correct counsel's certainty that Y.B. was going to be excused; to the contrary, the trial court clearly understood counsel's comments as an objection to this inevitability and accordingly made a point of stating for the appellate record its reasons for excusing Y.B.  I do not believe more is required.  (See, e.g., *People v. Scott* (1978) 21 Cal.3d 284, 290 [objection deemed preserved if, despite inadequate phrasing, "the record shows that the court understood the issue presented"]; *People v. Partida* (2005) 37 Cal.4th 428, 434-435 [rejecting "formalistic[]" application of  objection requirement and construing objection under Evid. Code, § 352 as sufficient to preserve related due process claim].)

presence on the jury as ultimately constituted.  (*People v. Tate* (2010) 49 Cal.4th 635.)  Y.B. could also legitimately be disqualified on the alternative, independent ground of his reluctance to serve as a juror without input or knowledge as to sentencing, and the prosecutor had peremptory challenges to spare, in this trial prior to the effective date of Code of Civil Procedure section 231.7.  But Thompson rightly notes that sanctioning the disqualification of prospective jurors on the basis of their concerns about the fairness of the legal system to traditionally excluded minorities will have a disproportionate impact on prospective jurors from those very groups, Y.B.'s race aside.  (See, e.g., *People v. Suarez* (2020) 10 Cal.5th 116, 193 (conc. opn. of Liu, J.) ["In many cases, the magnitude of racial disparities is greater among jurors excused for cause than among jurors excused through peremptory strikes."].)  To the extent the trial court's questioning of Y.B. made clear to the jury panel the court's skepticism as to the very existence of systemic bias in the legal system, I am sure that this skepticism reflected the good faith, trust, and dedication of a veteran public servant.  But a long history of service in any institution— perhaps especially for those of us privileged to have risen through its ranks—can itself tend to normalize the institution's shortcomings.  In another case, where the question of the existence of bias might foreseeably inform the facts to be found by the jury, the trial court's comments could have resulted in cognizable prejudice to a party.  As it was, the trial court's comments to Y.B. here risked communicating to all present that, for the court as an institution, systemic bias could be reduced ad absurdum to the rhetorical question, "[S]o how would we ever have a trial for a [B]lack person, then?"

## II.    *The "Nature" of a Black Person on Trial for Murder*

As though to answer the court's skepticism about systemic bias, the prosecutor the next day drew the prospective jurors' attention to the fable of the scorpion and the frog.  I appreciate the majority's acknowledgment that "some jurors who were familiar with the fable, based on their lived experiences and perceptions, could have believed it was race based."  (Maj. opn., *ante* at p. 24.)  I would go further, however, both because the record

3

suggests that the trial judge and counsel alike either lacked that recognition or were reluctant to address it directly, and because the unintended racial implications of the prosecutor's comment were not limited in effect to those who could recognize those implications.

The trial court, to its credit, immediately recognized upon Thompson's objection that the fable at a minimum invited the prospective jurors to infer that Thompson had a propensity for violence. As another judge has observed, "[i]t is no doubt true that the 'frog and scorpion' story has been told in various contexts to convey varying messages. The initial question, however, is not whether the story fit when President Reagan told it in connection with the intractable problems of the Middle East or what it might mean in some other context, but *what its impact was in the context of this case*. Here, the obvious import of the story was that the jury should consider the character and nature of the defendant . . . and do something akin to not picking up the scorpion, i.e. convict him." (*United States v. Lang* (W.D.Okla. Jul. 13, 2007, No. CR-07-0080-HE) 2007 U.S. Dist. LEXIS 56655, at *7-8 (*Lang*), fn. omitted, italics added [granting new trial in view of "plainly improper import of the prosecutor's comments to the jury . . . [and] the absence of a timely curative instruction"].) To anyone on the panel who knew the fable, the prosecutor's invocation of the scorpion and the frog effectively conveyed the message that Thompson was—by nature—a deadly threat.

What this trial court likely did not then perceive, absent more explicit argument by defense counsel, was that deployment of the fable in the trial of a Black man— particularly one charged with a violent and ostensibly motiveless crime—echoed a durable racist trope of the "other" as intrinsically predatory, subhuman in its irrationality, and prone to repay trust with treachery. It is true that analogy and fable are not metaphor, and as the majority notes, the prosecutor never explicitly likened Thompson to a scorpion. Given the context, however, the prosecutor had no need to: there is no one else

4

in a homicide trial whose "nature," acts, motive or lack of motive would be at issue.[13] Explicit reference to Thompson's race was likewise unnecessary in this context: before the presentation of evidence or even opening statement, the prospective jurors had no foundational facts from which to infer anything about Thompson's nature; what they knew of him at that point, beyond the charges of which he was presumed innocent, was that he was Black. Accordingly, it sufficed that the prosecutor drew the connection between the anticipated absence of motive in Thompson's case,[14] the scorpion's nature, and, by extension, Thompson's. This allowed the "moral" of the interspecies fable, once set loose here in Thompson's trial, to play on implicit racist preconceptions bred by interracial fear.

As the majority duly notes, " 'we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' [Citations.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 667.) But just as I presume the prosecutor did not intend or recognize his reference to the fable as a coded racial appeal, the biasing potential of that reference likewise does not require a prospective juror's conscious recognition of its racial meaning. For those whose implicit biases made them prone to be more fearful of Thompson than they might be of a defendant of their own or some other race, the fable would validate those fears while also

---

[13] (See, e.g., *Lang*, *supra*, 2007 U.S. Dist LEXIS 56655, at *7 [finding "extraordinarily unpersuasive" the government's reliance on the prosecutor's "never [having] made any direct reference to the defendant as the scorpion"].)

[14] The prosecutor was entitled to probe their willingness to accept that point of law, which he appropriately did. Where he went too far was in next proffering a reason—one grounded not in law but in "nature"—that might mitigate the prospective jurors' curiosity about why the crime occurred, absent evidence of motive: like the scorpion stinging the frog that ferried it across the river, it was just something intrinsic to Thompson's nature.

suggesting an illegitimate means of resolving them.[15]  Conversely, for those who might be alert to the pervasiveness of implicit bias and the implications of the prosecutor's use of the fable, the trial court's skeptical questioning and dismissal of Y.B. would potentially inhibit their willingness in deliberations to counter comparable appeals to implicit bias by fellow jurors.  I do not imagine that the irony of the prosecutor's error following so soon after the trial court's rejoinder to Y.B.—"[S]o how would we ever have a trial for a [B]lack person, then?"—would have been lost on all the prospective jurors present.

Thompson at oral argument contended that existing precedent adequately apprised defense counsel and the trial court of these hazards.  Although it has long been controversial for a prosecutor in closing argument to explicitly deride criminal defendants as subhuman and, by implication, unworthy of civil rights, human rights, dignity, or mercy, it has seldom been treated as consequential.  (See, e.g., *People v. Powell* (2018) 6 Cal.5th 136, 183 ["no prejudicial misconduct"]; *People v. Brady* (2010) 50 Cal.4th 547, 585 ["does not necessarily invoke racial overtones"]; *People v. Duncan* (1991) 53 Cal.3d 955, 976–977 ["no impropriety in the argument"]; see also Stats. 2020, ch. 317, § 2, subd. (e) ["Existing precedent tolerates the use of racially incendiary or racially coded language, images, and racial stereotypes in criminal trials"].)  In closing argument, prior to the effective date of the Racial Justice Act, resort to beast metaphors might be excused as zealous if potentially inflammatory comment on evidence actually received about a defendant's actions.  (See, e.g., *People v. Krebs* (2019) 8 Cal.5th 265, 341 [condoning " 'wide range of epithets' "—including " 'animal' "—" 'to describe the egregious nature

---

[15] This concern is more than merely hypothetical on this record:  at least one prospective juror remained on the panel despite privately expressing his own bias, namely his belief that the jury panel was rife with noncitizens unlawfully participating in jury selection.  Nor should we disregard the corollary risk of prejudice to a Black witness or victim of crime, by being deemed "naturally" less worthy of belief or protection.

of the defendant's conduct,' " where supported by the evidence].)  During voir dire, in contrast, prospective jurors have heard no evidence on which an attorney might appropriately comment.  But our high court has also instructed us that prosecutorial error during jury selection—"a much less critical phase of the proceedings"—is less likely to be prejudicial than at other stages.  (*People v. Medina* (1995) 11 Cal.4th 694, 741.)  Accordingly, I do not believe we may presume that all competent attorneys and reasonable judges would have discerned the particular racial dimension of the brief comments in context here, without a more developed record.

It is unclear from defense counsel's own statements whether she in fact recognized the racial implications of the prosecutor's reference:  "So I'm not sure exactly what he was going for, but it seems to me that . . . he was going to try to say that it was in Mr. Thompson's nature to do whatever it is that he did. . . .  [¶] And I -- I can't even -- I can't even speculate as to where he was going, but I think the damage may have already been done . . . ."  Her comments are as consistent with an absence of recognition as with the familiar tactic of one accustomed to both recognizing invidious discrimination and simultaneously calculating the tactical risks of calling it out explicitly.  But to preserve for appeal a claim as to the racial implications of the prosecutor's comments, it was critical for counsel to make that point plain for the trial court and, absent a mistrial, to request a curative instruction or a more searching examination of prospective jurors on this point.  Without that exposition, the trial court lost an opportunity to counteract the potential impacts of the prosecutor's use of the fable—impacts exacerbated by trial court's own incredulity in responding to Y.B.'s concerns about institutional racism.  (See Cal. Code Jud. Ethics, canon 3B(6).)

The combined effect of squeamishness in the trial court in identifying the racial dimension of conduct by an attorney or judge, and the common insistence on appeal that timely curative instruction could only backfire, is to capitulate to implicit bias as inexorable and prone only to intensify—leaving it perpetually unexamined while

7

pursuing a hypothetical perfect mistrial/retrial and jury. Just as precedent calls for us to presume jurors will endeavor in good faith to follow the trial court's instructions on the law, we should presume their ability to heed a trial court's appropriate correction of inappropriate comments of its own or of its officers, its identification of concrete manifestations of implicit bias, and its call to recognize not only the persistence and systemic reach of implicit bias but our ability to account for it, with vigilance. The persistent belief that silence is preferable to any admonition, no matter how conscientiously crafted, instead mirrors the trial court's conviction that even speaking of systemic racism would taint the entire panel. I choose to believe we can do better.

_____

LIE, J.

8

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H044699 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1514611) |
| v. | ORDER CERTIFYING OPINION FOR PUBLICATION |
| GREGORY JERMAINE THOMPSON, | |
| Defendant and Appellant. | |

THE COURT:

The opinion in the above-entitled matter filed on August 11, 2022, was not certified for publication in the Official Reports. The Independent Defense Counsel Office has requested the opinion be certified for publication. Under California Rules of Court, rule 8.1105(c), the opinion is ordered published.

_____

BAMATTRE-MANOUKIAN, ACTING P.J.

_____

LIE, J.

_____

WILSON, J.

*People v. Thompson*
**H044699**

Trial Court:                                    Santa Clara County Superior Court
                                                Superior Court No.:  C1514611


Trial Judge:                                    Hon. Griffin M.J. Bonini


Attorneys for Plaintiff and Respondent:         Rob Bonta
The People                                      Attorney General of California
                                                Lance E. Winters
                                                Chief Assistant Attorney General
                                                Jefferey M. Laurene
                                                Senior Assistant Attorney General
                                                Eric D. Share
                                                Supervising Deputy Attorney General
                                                Katie L. Stowe
                                                Deputy Attorney General



Attorneys for Defendant and Respondent:         Patrick J. McKenna
Gregory Jermain Thompson                        Sixth District Appellate Program


*People v. Thompson*
**H044699**